EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
**IREDALE & YOO, APC**
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525   FAX: (619) 233-3221

**Attorneys for Plaintiffs the Estate of Carlos Escobar Mejia, Rosa Escobar, Maribel Escobar and Juan Antonio Escobar**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF CARLOS ESCOBAR MEJIA by and through its successor in interest ROSA ESCOBAR, ROSA ESCOBAR, MARIBEL ESCOBAR and JUAN ANTONIO ESCOBAR as individuals,<br><br>                Plaintiffs,<br><br>v.<br><br>GREGORY ARCHAMBEAULT; JAMES DOBSON; CORECIVIC OF TENNESSEE LLC; CHRISTOPHER LAROSE; JOSEPH ROEMMICH; DOES 1 through 50, Inclusive, and ROES 1 through 50, Inclusive,<br><br>                Defendants. | CASE NO. 20-cv-2454-MMA-KSC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1) Negligence<br>2) Intentional Infliction of Emotional Distress<br>3) Wrongful Death (CCP 377.60)<br>4) Violation of the Bane Act<br>5) Violation of Cal. Civ. Code §51 (Unruh Act)<br>6) Violation of 29 U.S.C. §794(a) (Rehabilitation Act)<br>7) *Bivens* Action for Deliberate Indifference to Serious Health and Safety Needs<br><br>**<u>Jury Trial Demanded</u>**<br>(Rule 38, F.R.Civ.Pro.) |

COMES NOW Plaintiffs THE ESTATE OF CARLOS ESCOBAR MEJIA, by and through its successor in interest ROSA ESCOBAR, ROSA ESCOBAR, MARIBEL ESCOBAR and JUAN ANTONIO ESCOBAR as individual plaintiffs, through their attorneys of record, Iredale and Yoo, APC, and allege and complain as follows:

## I.
## INTRODUCTION

Carlos Escobar died of COVID on May 6, 2020.  He contracted the disease while in confinement at the Otay Mesa Detention Center, a detention facility run for profit by CoreCivic and under the control of ICE officials Archambeault and Dobson.  CoreCivic, LaRose and Roemmich detained Mr. Escobar in conditions which they knew would expose him to a deadly disease.  CoreCivic deprived him of adequate personal protective equipment, proper social distancing, and appropriate prophylaxis and hygienic conditions, all with the knowledge and participation of ICE and its officials.  His death did not have to happen.

## II.
## GENERAL ALLEGATIONS

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.  Plaintiffs intend to amend this complaint to add the United States as a defendant pursuant to 28 U.S.C. §1346 (Federal Tort Claims Act) upon completion of the FTCA claims process.

2.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of California because a substantial part of the acts or omissions which form the basis of Plaintiffs' claims occurred in the Southern District of California.

## III.
## PARTIES

3.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

4.    Plaintiffs' decedent Carlos Escobar died in San Diego County. Plaintiffs Maribel Escobar, Rosa Escobar and Juan Antonio Escobar are residents of Los Angeles, California.  Rosa Escobar brings this action on behalf of the Estate of Carlos Escobar Mejia.  (See Exhibit 1 attached and incorporated herein by reference).  Maribel Escobar, Rosa Escobar and Juan Antonio Escobar also bring suit as individuals.

5.    At all times relevant to this complaint, Defendant CoreCivic, Inc. formerly known as Corrections Corporation of America, Inc. (herein referred to as "CoreCivic") was a for-profit Maryland corporation whose principal office is located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215 and whose registered agent for service of process is CT Corporation System, 800 Gay Street, Suite 2021, Knoxville, Tennessee 37929. As part of CoreCivic's business, it owns/operates jails, prisons and other correctional facilities throughout the United States under contract with various government entities.

6.    At all times relevant to this action, CoreCivic conducted business within San Diego County when operating the Otay Mesa Detention Center.

7.    At all times relevant to this action, Defendant Gregory J. Archambeault was the San Diego Field Office Director for ICE Enforcement and Removal Operations, an agency within the U.S. Department of Homeland Security. Archambeault was charged with having legal custody of decedent, an ICE detainee. Archambeault was required to insure that decedent was not subjected to an unreasonable risk of disease or death while in ICE custody.  Archambeault was deliberately indifferent to decedent's serious health and safety needs.

8.    At all times relevant to this complaint, Defendant James Dobson was the Otay Mesa Detention Center officer in charge of immigration detention operations at the Otay Mesa Detention Center, and was a legal custodian of decedent.

9. At all times relevant to this action, Defendant Christopher LaRose was the Senior Warden at the CoreCivic Otay Mesa Detention Center operation.

10. At all times relevant to this action, Defendant Joseph Roemmich was the Assistant Warden at the CoreCivic Otay Mesa Detention Center operation.

11. At all times relevant to this complaint, LaRose, Roemmich, and DOES 1-50 were officials, agents, employees, contractors, and/or sub-contractors of CoreCivic.

12. At all times relevant to this complaint Archambeault, Dobson and ROES 1-50 were officials, agents, and employees of ICE and were acting within the full course and scope of their agency and employment.

13. At all relevant times, the Doe and Roe defendants were acting in their professional capacity within the course and scope of their agency and/or employment, and/or were the agents, servants and employees of each other and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer.

14. Plaintiffs are truly ignorant of the true names and capacities of DOES 1-50, and ROES 1-50, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities as well as the facts giving rise to their liability have been ascertained.

15. Plaintiffs are informed and believe and thereon allege that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by such Defendants.

**IV.**
**FACTS**

16. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

17. Carlos Escobar-Mejia was 57 years old at the time of his death.

18. Mr. Escobar never married. He had no children. He died intestate. Both his parents are dead.

19. Mr. Escobar is survived by two sisters, Maribel Escobar and Rosa Escobar, who are United States citizens, and a brother, Juan Antonio Escobar, who is a legal resident of the United States.

20. Mr. Escobar would have turned 58 in May of 2020.

21. Maribel and Carlos Escobar, along with their mother, escaped El Salvador during its civil war to join Rosa, who was already in the United States. One brother had been brutally murdered. They escaped El Salvador after Mr. Escobar's sister narrowly escaped being murdered.

22. Decedent had been living in the United States for 40 years. He lived with Rosa in the Los Angeles area.

23. Mr. Escobar lived with the trauma of those events in El Salvador.

24. Mr. Escobar had criminal convictions that were about 30 years old, which included a DUI.

25. Mr. Escobar was stopped in a car by the Border Patrol in Chula Vista on January 10, 2020. He was in ICE custody from that date to the time of his death on May 6, 2020.

26. Mr. Escobar had no criminal charges pending against him.

27. Mr. Escobar was held in the Otay Mesa Detention Center. He was not accused of committing any crimes. He was waiting to appear before an immigration judge to argue that he should be allowed to remain in the country.

28. Mr. Escobar was vulnerable to the Covid virus. He was at high risk for dying if he contracted the virus because of his underlying medical conditions. Mr. Escobar suffered from diabetes. He had undergone several operations which left him without his right foot because of complications of that disease.

29. Mr. Escobar suffered from high blood pressure and heart problems.

30. Defendant CoreCivic is a private operator of correctional facilities with contracts for services with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Marshals Service ("USMS").

31. Otay Mesa Detention Center ("OMDC") is a contract detention facility (CDF). It is an immigration detention center, owned and operated by Defendant CoreCivic and located in San Diego, California which housed, *inter alia*, ICE detainees.

32. OMDC houses approximately between 1200 to 1300 detainees and inmates.

33. Defendants Archambeault and Dobson, as federal officials, had a constitutional obligation to insure that Carlos Escobar was not subjected to unsafe conditions which imposed an unreasonable risk of death. Archambeault and Dobson were constitutionally obligated to ensure that reasonable sanitation, prophylaxis and protection from infection were afforded to decedent Carlos Escobar Mejia.

34. Instead of doing their constitutionally required job, Archambeault and Dobson acted with deliberate indifference to the safety, sanitary and health needs of Mr. Escobar and the ICE detainees. They failed to timely reduce the population in the facility. They were aware that overcrowding which made socially distancing impossible. Archambeault and Dobson were aware of, and ratified, the conduct of CoreCivic, LaRose and Roemmich in imposing and maintaining conditions in the OMDC which made it a hothouse for transmission of COVID. With knowledge that those living conditions would cause disease, suffering and possible death, defendants deliberately took no remedial action of any consequence until after decedent had already been infected with COVID, suffered, and was hospitalized shortly before he died.

35. Immigration detainees are civil detainees whose constitutional protections while in custody derive from the Fifth Amendment Due Process clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Immigration detainees in Otay Mesa

are entitled to greater rights than persons in pretrial criminal custody or people serving criminal sentences. *Jones v. Blancas*, 393 F.3d 918, 933-34 (9th Cir. 2004); *King v. Cty. Of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment when conditions of confinement for civil detainees are similar to those faced by pretrial criminal detainees).

36.    When the government takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume responsibility for his safety and general well-being. *DeShaney v. Winnebago Cty. Dept. Of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  As a result, the government must provide those in its custody with food, clothing, shelter, medical care, and reasonable safety.

37.    Conditions that pose an unreasonable risk of harm violate the Eight Amendment's prohibition against cruel and unusual punishment, and the Fifth Amendment's Due Process Clause.

38.    The Eight Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

39.    The Supreme Court has explicitly recognized that the risk of contracting a communicable disease constitutes such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

40.    While the Eight Amendment prohibits punishment that is "cruel and unusual," the Due Process Clause of the Fifth Amendment prohibits *any punishment at all* for someone who is not convicted of a crime.  *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *see also Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1163-64 (9th Cir. 2020).  Conditions that would violate the Eight Amendment rights of an individual serving a criminal sentence are more than enough to violate the Fifth Amendment due process rights of a civil detainee.

41.   Defendant CoreCivic did not ensure proper training for its employees. It provided only six weeks of training for CoreCivic employees.  The training focussed on self-defense and correctional techniques. There was brief on-the-job training for employees in the housing units for a couple of days.  This involved the new Detention Officer "shadowing" the housing unit officer.  There was no requirement that the officers demonstrate competence, or pass any exam or assessment.

42.   There were approximately forty hours of training for detention officers who work as segregation officers.  However, there is no other on-the-job training for many of the other units.

43.   Training for new officers began within only a few months of their employment.  Detention Officers with very little experience train new officers.

44.   CoreCivic did not train Detention Officers on how to handle infectious diseases, even though they are on the front lines of interacting with potentially infected persons.

45.   Detainees are responsible for cleaning the facility.  They were not trained on how to clean properly.  On information and belief, the efficacy of the cleansing agent was dependent on leaving the cleaner on a surface for ten minutes. Sinks and showers were shared among dozens of detainees/inmates without disinfection between each use.

46.   Detainees were not consistently given gloves, even when they were required to clean the unit with used rags.  Oftentimes the cleaner ran low in the housing units and the "porters" (cleaning crew) did not have what they needed to properly sanitize the housing units.

47.   During February, March and April 2020, there were serious shortages of sanitation supplies.  There was very little soap or shampoo.  Toilet paper was rationed in the housing units. On numerous occasions, officers and staff broke bars of soap in half to provide to detainees.  There were many days when housing units

- 8 -
20-cv-2454-MMA-KSC

were completely out of soap, shampoo, and toilet paper. There was a severe shortage of paper towels and antibacterial hand sanitizer.

48.    CoreCivic repeatedly placed profits over inmate's/detainee's and Detention Officers' safety, stinting in the provision of hygienic products.

49.    CoreCivic retaliated against their own officers when they raised concerns about safety.

50.    On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by the novel coronavirus, a pandemic.

51.    It was well established that COVID-19 is easily transmitted, especially in group settings. The disease can cause serious illness and death.

52.    There was no effective cure. Until widespread vaccination, everyone is at risk of infection.

53.    The CDC has explained that COVID-19 appears to spread easily and sustainably within communities. It transfers primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes, and may transfer through contact with surfaces or objects contaminated with these droplets. There is asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms.

54.    According to the CDC, older adults and people who are immunocompromised, have severe chronic medical conditions such as heart, lung or kidney disease, moderate to severe asthma, obesity, diabetes, or other serious underlying medical conditions are at higher risk for more serious COVID-19 illness. Early data suggested older people are twice as likely to have serious COVID-19 illness.

55.    The CDC has identified that the data suggests a disproportionate burden of illness and death among racial and ethnic minority groups and among COVID-19 deaths for which race and ethnicity data were available.

56. Individuals who survive COVID-19 may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications.

57. At Otay Detention Center, the risk of spread was apparent. Employees of Otay Detention Center worked in close proximity to one another and inmates and detainees who were maintained in very close quarters.

58. Taking steps to prevent the COVID-19 from entering and spreading throughout the facility was of the utmost importance in this type of working environment. Defendants were well aware of these risks and the problems these conditions caused. They deliberately did nothing to ameliorate the conditions until after decedent died.

59. In or around March 2020, COVID-19 cases across the United States and in San Diego County rapidly increased. On March 12, 2020, the CDC reported 1,215 cases with 36 deaths. By March 30, the CDC reported 140,940 cases with 2,405 deaths. Approximately one month later, on April 28, 2020, the CDC reported 981,246 cases with 55,258 deaths. On March 13, 2020, San Diego County reported 5 cases, and by March 23, there were 213 cases. Approximately one month later, on April 27, 2020, San Diego reported 3,141 cases and 113 deaths.

60. The threat of spread of COVID-19 outside of the detention center was so apparent that government agencies issued "shelter in place" orders and social distancing mandates, which requires persons to stay at least six feet distance apart from each other.

61. By March 17, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued shelter in place limitations across the Bay Area, requiring everyone to stay safe at home except for certain essential needs.

62. Two days later, on March 19, 2020, the State of California issued a state-wide "shelter in place" order requiring people to stay at home except for essential activities and to maintain social distancing to the maximum extent possible.

63. During the weeks leading up to Plaintiff's death, Defendants were aware of the grave nature of COVID-19 and its rapid transmission.

64. Before Carlos Escobar contracted COVID, Dr. Joseph Amon, an infectious disease expert, warned that absent drastic measures, "[OMDC] will not be able to prevent COVID-19 transmission once introduced into the facility." *Sagastume et al v. Archambeault et al*, Case no. 3:20-cv-00658-LAB-MSB (S.D. Cal. Apr. 3, 2020) Doc. 2-7 – Amon Decl. in Support of Plaintiff-Petitioner's Motion for a Temporary Restraining Order, ¶ 20.

65. At the time of Mr. Escobar's death, Otay Mesa had one of the highest numbers of cases of the novel Coronavirus ("COVID-19") of any immigration detention facility in the country.[1] As of June 18, 2020, official figures showed 164 confirmed COVID-19 cases among detainees at OMDC.[2] At least eleven ICE officers at OMDC tested positive.[3]

66. During the weeks leading up to Plaintiff's death, Defendants were repeatedly advised by numerous sources to take measures to prevent the spread of COVID-19 in its facility.

67. During the weeks leading up to Plaintiff's death, Defendants failed to adequately respond to the COVID-19 pandemic. Defendants created a deadly environment by their refusal to take protective measures.

68. On March 12, 2020, CoreCivic posted on its website, "Consistent with CDC recommendations, personal protective equipment (PPE) such as face masks are allowed to be worn by staff and those in our care within the facility. Disposable

---

[1] Alejandro Lazo & Zusha Elinson, *Inside the Largest Coronavirus Outbreak in Immigration Detention, The Wall Street Journal*, (Apr. 30, 2020), https://www.wsj.com/articles/inside-the-largest-coronavirus-outbreak-in-immigration-detention-11588239002.

[2] Immig. and Customs Enforcement, *ICE Guidance on COVID-19: Confirmed Cases*, https://www.ice.gov/coronavirus (last updated June 18, 2020).

[3] *See* id.

gloves are readily available for staff conducting searches and handling property. Staff working at the front lobby screening site wear PPE." This statement was false.

69. CoreCivic had not provided gloves or masks to its entire staff.

70. Instead, CoreCivic expressly prohibited its employees from wearing masks in the housing units and other areas of the facility. CoreCivic informed its staff of this prohibition in multiple briefings sessions. On information and belief, CoreCivic informed its staff that if they provided masks to the Detention Officers, then it would frighten the inmates/detainees and CoreCivic would have to provide them to them as well, which would cause CoreCivic to go over budget.

71. Margarita Smith, an officer who was named CoreCivic's Otay Mesa employee of the year in 2019, told the press that managers frequently discouraged workers from wearing masks. "They didn't want anyone wearing masks," said Smith, who was tapped by CoreCivic to lead an employee morale committee in January. "They said it would frighten the detainees and make them think that we're sick or something."

72. Detention Officers were rarely able to find gloves. Some boxes of gloves were placed in pods, but many times they were not there or were too small. Even Detention Officers who were responsible for patting down detainees when necessary were not provided with gloves or masks.

73. The restrooms used by detainees and staff were periodically cleaned by detainees, as well as the dining hall tables and kitchen. On information and belief, the detainees did not have proper instruction on how to use the cleaner so that it was effective. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes.

74. CoreCivic did not provide any cleaning sanitizer or disinfectant wipes to staff, so staff could prevent the spread of infection. There were sanitizer dispensers in only certain areas of the facility, but they were for the most part empty.

75.     Each morning, the officers were required to clock in and out through the same device, by placing a finger on the device or punching in times multiple times throughout the day.  At the end of the day, they were required to answer a series of questions on the device by punching the buttons. The device was not regularly cleaned.  Even in the midst of the COVID-19 pandemic, the device never got cleaned.

76.     On information and belief, the kiosk machine that the officers were required to touch in order to obtain and return keys for the different departments in which they were working at the start and end of their shifts was not regularly cleaned. Neither were the keys that were used by different Detention Officers each day.

77.     Officer equipment, such as handheld radios, handcuffs, and pepper spray from Central Control were not regularly cleaned.  The employee(s) in charge of handing out equipment to other officers did not wear gloves or masks while carrying out these duties.

78.     The grey bins that staff and visitors place items in, such as shoes, lunch, jackets, purses, and backpacks, and which are run through a metal detector in the main lobby entrance, were not disinfected.

79.     There were never any deep cleanses of the facility, even in the midst of the COVID-19 pandemic.

80.     CoreCivic continued to feed detainees in the dining hall, which served approximately two housing units at the same time, approximately 240 persons at once.

81.     Throughout the month of March, 2020, CoreCivic continued to hold and require employees to attend daily briefing sessions.  These briefing sessions were held in a break room with approximately thirty to forty people at once.

82.     During the briefing sessions, on multiple occasions CoreCivic employees raised social distancing and sanitation concerns.

83. In one briefing session, employees asked how social distancing was possible in the facility, specifically, the housing units and in the dining hall, where detainees from multiple pods were placed during meal times. The response in effect was "we understand that, but do your job," or words to that effect.

84. Detention Officers, including Detention Officer Rincon and Officer Cabadas (who worked in the kitchen) brought up the fact that when they hand food trays to detainees, they are face to face, within approximately one foot of each other. A Doe Defendant responded that they could absolutely not wear a face mask because it would intimidate detainees because the detainees do not have masks.

85. On March 17, the day that San Diego limited public gatherings to 50 people and closed restaurants, CoreCivic officers pressed for clean rags, but LaRose told them there was no need because the "chemicals" were very powerful. Their questions and demands for more wipes and gels were not taken seriously.

86. On or about March 18 or 19, 2020, detainees were directed to clean every hour in their pod. However, detainees were given a watered-down solution to clean everything, with one part cleaner and three parts water. CoreCivic's Safety Manager Boyce informed the staff that the majority of the cleaning product was water to prevent suicide in case a detainee drank it.

87. Detainees reported that rags were dirty and that they were using the same towel to clean toilets, door handles, phone receivers and their hands. One detainee told the staff that she cleaned houses and that the same towel cannot repeatedly be used. The officers told her, "Oh, we have a special chemical. It kills the bacteria."

88. CoreCivic did not provide any protocols or directions related to decreasing the risk of transmission in its facility, nor directions on how to practice social distancing in the facility, nor did it implement any steps to properly disinfect and clean or provide protective gear in response to the COVID-19 pandemic.

89. The facility was filled with so many detainees that social distancing was nearly impossible. Nothing was implemented to attempt social distancing. Most of the housing units were in excess of 100 persons. The bunk beds are no more than four feet from one another. Because of the high volume of detainees, CoreCivic made it impossible for them to line up six feet apart in order to receive their meals or to wait in line as staff move them between different areas of the facility.

90. CoreCivic did not take temperatures of persons before they entered the facility or otherwise examine them to determine if they were experiencing any COVID-19 related symptoms until after late March 2020.

91. When CoreCivic did begin taking temperatures, it did so in the enclosed small lobby of the facility. CoreCivic was readily able to take temperatures outside of the facility to ensure persons with a temperature did not actually enter into the building. This practice increased the risk of transmission.

92. Defendant Roemmich told staff that wearing masks are prohibited unless a sign is posted, and that if they refused to take off masks, they would be "sent home on your own dime." Roemmich reportedly told staff, "Look at your ID badge. It's a number, not a name. Everyone's disposable."

93. On or about March 31, 2020, an employee tested positive for COVID-19.

94. On information and belief, the employee who confirmed positive with COVID-19 left work.

95. On April 1, 2020, the staff learned that the employee who was infected with COVID-19 had worked on mid-shift (graveyard) in Central Control and had handed out equipment to all of the employees on that shift. This could have led to the infection of each of the employees on that shift and in turn, and to others they are in contact with. This was in direct contradiction to what CoreCivic had led reporters to believe, which was that the detainees were not exposed to COVID-19

because the infected Detention Officer did not have contact with them in their housing units.

96. That same day, an officer named Gregory Arnold spoke with Warden Christopher LaRose after hearing a captain say that face masks were prohibited. Warden LaRose told officer Arnold, "You can't wear the mask because we don't want to scare the employees and we don't want to scare the inmates and detainees." Arnold told the warden that was ridiculous. Arnold told the warden that he wanted to wear a mask and gloves. LaRose was unmoved.

97. On April 4, 2020, 35 detainees went on a five-day hunger strike because a detainee who worked in the dining hall handling food appeared to have a fever, for which he was given only ibuprofen.

98. A detainee named Edgar Granski gave an interview to KPBS, stating that sick detainees in his pod were told to gargle saltwater instead of being tested for Covid-19.

99. CoreCivic directed a KPBS reporter's question about the conditions to ICE, which in turn denied that there was a hunger strike at Otay Mesa.

100. Elizabeth Cruz, a woman detained at Otay Mesa, said a detainee who was coughing badly in the cell the first week of April was removed for about a week, returned and removed again before testing positive. Cruz said she reported chest pain and breathing difficultly for two weeks but couldn't get more than allergy medication.

101. "I know my body and I am not well," Ms. Cruz remembers telling a nurse, who told her there was nothing more she could do.

102. Ms. Cruz eventually tested positive and was placed in isolation with eight other infected detainees.

103. On April 10, 2020 a box of surgical masks arrived at the facility. The staff handed to a group of female detainees a contract written in English which the

women would have to sign in order to receive a mask. The contract was a waiver of liability against CoreCivic. The majority of the women did not speak English.

104. When the unit manager began to verbally translate the document into Spanish, one of the bilingual detainees noticed that the manager skipped over the entire "hold harmless" section. When the bilingual woman pointed that out, the detainees became upset and refused to sign.

105. The unit manager reiterated that they would not be given masks without signing. When the women demanded the masks, the staff threatened the women with pepper spray.

106. Three women, including the woman who had recognized the translation error, were taken away. The women decided to begin a hunger strike that would not end until the three women were returned. Five hours later, the masks were distributed and the three women were returned.

107. Around April 17, 2020, Mr. Escobar started showing symptoms of Covid-19, vomiting and feeling gravely ill.

108. Instead of the hospital, Mr. Escobar was taken to a designated area with other detainees diagnosed with COVID-19. Had Mr. Escobar had been taken directly to a hospital when the seriousness of his illness first became obvious, rather than being quarantined in a unit with infected detainees, he likely would have had a significantly higher probability of survival.

109. "He complained many times," said José Antonio Vidal Basa, adding that the other men in the unit would sometimes wheel Mr. Escobar to a nurse looking for help. "He's feeling bad," Vidal Basa recalled telling medical staff. "He never comes out of his room and he's always sick. Can we please do something about it?"

110. Mr. Escobar was given ibuprofen to treat his symptoms.

111. Vidal Basa, who also contracted COVID-19, said Mr. Escobar was routinely instructed to fill out a sick card, which in theory would set in motion a formal medical response from the facility. "He would sign it and they would bring

him back — the same thing over and over again," he said.  "They would never do nothing about it."

112.  Mr. Escobar was given ibuprofen to treat his symptoms, the men in his unit recalled. He was living on bologna sandwiches and crackers, the only meal detainees were given for breakfast, lunch, and dinner, said Tomas Enrique Castro Lopez.  According to Castro Lopez, who took on the role of caretaker for Mr. Escobar inside the facility, virtually all kitchen staff preparing the food were eventually stricken with the virus.

113.  Instead of providing medical care, Defendants deliberately denied medical care to decedent.

114.  On April 24, 2020, Mr. Escobar was finally sent to Paradise Valley Hospital in National City and placed on a ventilator.  By the time defendant transported him to the hospital, Mr. Escobar was gasping for air and dying.  He received a blood transfusion but he had already been too weakened by the virus.

115.  Conditions at Otay Mesa were unconstitutional because detainees were at "substantial risk of serious illness or death."

116.  The U.S. District Court ordered ICE to review cases of medically vulnerable persons for release.  Mr. Escobar was on the list.  At the hearing in Court, Mr. Escobar was already *in extremis.*

117.  At the hearing on May 4, 2020, the government admitted it was probably too late to save Mr. Escobar.  The government attorney told the Court that Mr. Escobar's condition was serious and suggested prayers.

118.  On May 6, Mr. Escobar died.

119.  Back at Otay Mesa, the men who cared for Mr. Escobar tacked letters to his door, including apologies to his sister Rosa for failing her brother.  Inside the room, his dried vomit still caked the floor.

120.  "We're less than human to these people," Mr. Navarez said. "This person was neglected and now he lost his life.  What has to happen in order for them

to take us serious? How many more people have to be hurt? How many more people have to die?"

121. After his death, CoreCivic's spokesperson Amanda Gilchrist wished "this individual's" family well and stated the company was not responsible for medical care. Gilchrist told reporters that detainees received masks and could get new ones if they requested them.

122. On May 8, Senate Judiciary Committee Ranking Member Dianne Feinstein called for a committee hearing on safety of ICE detention facilities following Mr. Escobar's death. Senator Feinstein issued a statement that "the death of Carlos Escobar-Mejia is deeply troubling. ICE is detaining approximately 29,000 individuals in detention centers that have a poor history of medical care."

123. Senator Feinstein noted in her letter to Senator Lindsey Graham that only 1,528 detainees had been tested and that 753 of those tested positive. "This means that nearly half of those tested are already infected with Covid-19. This warrants the Committee's immediate attention, and I ask that you hold a hearing into the death of Mr. Escobar-Mejia and conditions at ICE facilities nationwide."

124. Despite ICE stating that cloth face coverings should be worn by detainees, cloth facemasks were not distributed. Detainees finally received one (1) disposable paper mask. Those masks were to be reused again and again. They disintegrated or became dirty. When that happens, detainees were forced to wear their shirts as protective gear.

125. Soap, a basic requirement for hygiene even outside of a pandemic, was not provided to detainees on a continuous or adequate basis.

126. On Monday April 20, 2020 there were 18 migrant detainees in OMDC who had tested positive for COVID 19. Just four days later, on April 24, 2020 there were 111 detainees at OMDC who were positive for COVID-19, an increase of 517%. The abysmally inadequate precautions at Otay Mesa placed the lives of 111

people in custody, 17 CoreCivic staff, eight medical staff and eight ICE employees at the facility, who have all tested positive for COVID-19, at risk.

127.  Defendants' deliberate delay or refusal to provide reasonable conditions and care constitutes objective deliberate indifference in violation of the U.S. Constitution and has caused at least 111 immigrants at OMDC to needlessly become infected with the potentially deadly virus.

128.  When California Assembly member Lorena Gonzalez tried to deliver 1,000 face masks to OMDC on April 24, 2020, defendants turned the donation away, despite the continuous reports of inadequate supplies at the detention facility.[4]

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(By all Plaintiffs Against CORECIVIC, LAROSE, ROEMMICH and DOES 1-50)**

129.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.  Plaintiffs intend to amend this complaint and add individual defendants and the United States to all causes of action after they have completed their compliance with the FTCA claims procedure.

130.  Defendants had a duty to execute their duties faithfully and lawfully as charged with the custody and care of detainees such as Mr. Escobar.  Defendants had a duty to act with care and prudence to safeguard the health and safety of detainees.  Defendants had a duty to act with care and prudence towards Mr. Escobar and to not cause harm or injury to Plaintiff.

131.  Defendants failed to act with care and breached the aforementioned duties.  Their actions fell below the standard of care.  The breach of their duty, as described herein, was a substantial factor in causing Mr. Escobar's death.  Their

---

[4]  Kate Morrisey, *Advocates with Mask Donation Turned Away From San Diego Immigration Detention Center*, The San Diego Union Tribune (Apr. 25, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-04-24/advocates-with-mask-donation-turned-away-from-san-diego-immigration-detention-center.

breach of their duties was a substantial factor in causing Plaintiff to suffer serious emotional and physical distress injuries and death.

132. As a direct and proximate result of Defendants' breach of their duties, as described herein, Mr. Escobar suffered physical, mental, and emotional damages in an amount to be determined by proof at the time of trial.

**SECOND CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(By all Plaintiffs Against CORECIVIC, LAROSE, ROEMMICH and DOES 1-50)**

133. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

134. Defendants' refusal to permit any form of protection against a deadly virus at Otay Mesa during the COVID-19 pandemic was outrageous.

135. Defendants willfully and/or recklessly failed to operate Otay Mesa in a responsible manner to prevent COVID-19 from spreading and infecting numerous detainees, including Carlos Escobar.

136. Defendants' actions in sacrificing the welfare of those in their care to the demands of profit amount to extreme and outrageous conduct.

137. Defendants were aware that engaging in this willful and/or reckless conduct had a probability of causing Carlos Escobar to suffer from severe emotional distress, and for his family members to suffer extreme distress because of his illness and death.

138. Mr. Escobar did suffer extreme emotional distress, both before and during his suffering from COVID-19, which resulted in his death.

139. Not operating Otay Mesa in a responsible manner to prevent the spread of COVID-19, a deadly and novel virus, from spreading caused Carlos to suffer severe emotional distress because he contracted COVID-19 and he and his family helplessly watched him die from it.

140. Defendants' actions have legally, proximately, foreseeably, and actually caused Carlos and Plaintiffs to suffer severe emotional distress.

141. Defendants intentionally violated and/or recklessly acted in a manner that caused Carlos to contract COVID-19, suffer from the illness for weeks, and die, which constitutes conduct that exceeds all bounds tolerated by a civilized society.

## THIRD CAUSE OF ACTION
### WRONGFUL DEATH (CCP 377.60)
**(By all Plaintiffs Against CORECIVIC, LAROSE, ROEMMICH and DOES 1-50)**
**(Based on Negligence, Violations of the Bane Act, Civil Code §51 and Rehabilitation Act)**

142. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

143. Defendants committed wrongful acts which proximately caused the death of Carlos Escobar.

144. Defendants' decision to not follow CDC guidelines was a substantial factor in causing Carlos's death. It was reasonably foreseeable that failure to implement social distancing policies and provide masks, gloves, and sanitation materials would lead to Carlos dying from COVID-19.

145. Once Defendants were aware that Mr. Escobar was ill, they refused to transport him to the hospital. They denied him any medical care for days.

146. These acts resulted in the death of Carlos Escobar.

147. CoreCivic is responsible for the acts of individual defendants under the theory of *respondeat superior*.

148. The wrongful acts alleged above have destroyed Maribel's and Rosa Escobar's relationship with their brother, Carlos Escobar, and have legally, proximately, foreseeably, and actually caused severe emotional damages, including the loss of society, companionship, comfort, counsel and care. It has caused

- 22
20-cv-2454-MMA-KSC

emotional distress, and further economic and non-economic damages according to proof at the time of trial.

## FOURTH CAUSE OF ACTION
### BANE ACT
**(By the Estate of Carlos Escobar Against CORECIVIC, LAROSE, ROEMMICH and DOES 1-50)**

149.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

150.   The California Legislature declared that it violates our state civil rights act for any person to interfere with the exercise or enjoyment by an individual of his/her rights secured by the United States Constitution or state or federal law.  This includes any interference of these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

151.   Defendants interfered with Mr. Escobar's rights to bodily integrity and humane treatment by the use of intimidation, coercion, and retaliation as alleged above.

152.   This interference with Mr. Escobar's rights was perpetrated in violation of California Civil Code § 52.1 and Mr. Escobar's right to be free from cruel and unusual punishment, right to bodily integrity and human treatment, and retaliatory animus under the California and Federal Constitutions.

153.   Due to the violation of Mr. Escobar's rights by these Defendants, Mr. Escobar suffered damages, including but not limited to emotional distress, pain and suffering, and further damages according to proof at the time of trial.

## FIFTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 51)
**(By all Plaintiffs Against CoreCivic)**

154.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

155.   Pursuant to the Unruh Civil Rights Act, all persons within the jurisdiction of this state are free and equal, and no matter their sex, race, color,

religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status, are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

156.  Defendants violated the Unruh Act by denying Carlos Escobar the full and equal accommodations, advantages, facilities, privileges or services as other persons who did not suffer from his disability, that of being a diabetic and partial amputee, suffering from heart disease and high blood pressure.

157.  Proper housing, safe cell placement, and safe transportation to a hospital are services or accommodationsto which Carlos Escobar was entitled.

158.  Carlos Escobar was experiencing a medical emergency and required assistance by medical care professionals.  Carlos Escobar was denied these services on the basis of his disability.  CoreCivic failed to transport Mr. Escobar to the hospital despite obvious symptoms of illness and medical need.

159.  Carlos Escobar required services which included a proper and accurate assessment of his medical conditions.  Carlos Escobar required the accommodations and services of a proper medical assessment and placement in a cell where he could be safe.  Defendants denied Carlos Escobar these services on the basis of his disability.

160.  Defendant CoreCivic was specifically aware that Mr. Escobar was medically vulnerable and Covid 19 could kill someone with his preexisting medical conditions.  Despite this knowledge, CoreCivic failed to provide Mr. Escobar with PPE, cleaning supplies or a safe living space in which to prevent an infection.

161.  All of the actions of CoreCivic in refusing the heed the warnings of the staff and the detainees that the failure to implement a system to provide a safe environment would cause an outbreak were the direct cause of Mr. Escobar's infection and death.

162.  As a direct and proximate result of Defendants' actions, as alleged herein, Carlos Escobar as well as Plaintiffs, were injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

163.  In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

## SIXTH CAUSE OF ACTION
### (Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### (By all Plaintiffs Against CoreCivic)

164.  Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

165.  The Rehabilitation Act of 1973 ("Section 504") provides in pertinent part, provides that "No otherwise qualified individual with a disability in the United States  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

166.  Defendant CoreCivic is a program that receives federal financial assistance as defined in 29 U.S.C. § 794(b).

167.  Carlos Escobar was a disabled individual suffering from physical impairments that substantially limited one or more major life activities.  He was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

168.  A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such

impairment, or is regarded as having impairment. It was well documented that Mr. Escobar was medically vulnerable. Mr. Escobar suffered from diabetes. He did not have a right foot, which had been amputated. Mr. Escobar suffered from high blood pressure and heart problems, which also limited his life activities.

169. Defendants violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Carlos Escobar, a disabled person. It was a reasonable accommodation to transfer a patient with significant health conditions in a part of the facility where he would receive medical care and where he couldsustain social distancing, where he could be provided personal protective equipment.

170. Mr. Escobar's disabilities required that CoreCivic make reasonable accommodations to ensure that Mr. Escobar received the benefits of participation in proper housing, prophylaxis, quarantine procedures, and referral by CoreCivic for medical evaluation treatment and hospitalization. Put simply, Mr. Escobar's diabetes, heart condition, high blood pressure and amputated foot put him at a higher risk of death from COVID-19 if he contracted it. CoreCivic and its employees knew this. Instead of making accommodations to isolate Mr. Escobar, to provide proper prophylaxis and to keep him safe as they had the ability to do, CoreCivic discriminated by doing nothing to protect Mr. Escobar from infection and death. CoreCivic acted with deliberate indifference in denying reasonable care and accommodation to Mr. Escobar.

171. Employees of Defendant CoreCivic were deliberately indifferent to Carlos Escobar's serious medical condition. They failed to consider obvious symptoms of Carlos Escobar's health condition when they refused to quarantine him for his protection.

172. Instead of providing Mr. Escobar with adequate medical services and proper treatment, CoreCivic refused to provide him with medical care as his condition deteriorated.

173. Defendant CoreCivic failed to accommodate Carlos Escobar with the services and programs available to critical care patients. There were services readily available to Carlos Escobar, which was a placement in a hospital or a unit within the facility where health care was available.

174. Defendant knew of the substantial risk of harm to Carlos Escobar from his serious, diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to place him in Medical where he could be watched and provided medical care; and failing to take him to the hospital when he was in medical distress.

175. Defendant violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle detainees with a disability.

176. As a direct and proximate result of the Defendants' conduct as herein described, Carlos Escobar suffered damages in the amount to be determined at the time of trial. Because Carlos died as a result of defendants' actions, Plaintiffs suffered damages attendant to his death.

## SEVENTH CAUSE OF ACTION
**(Deliberate Indifference to Decedent's Serious Needs for Health and Safety)**
**(By the Estate of Carlos Escobar Against Defendants Archambeault and Dobson)**

177. Defendants Gregory J. Archambeault and James Dobson were federal officials, acting under color of federal law and authority.

178. Archambeault and Dobson were the legally authorized custodians of Mr. Escobar's person.

179. Archambeault and Dobson had a constitutional obligation to treat decedent in a reasonable and humane way, as he was within their purview, and unable to provide for his own needs.

180. As custodians of Mr. Escobar, Archambeault and Dobson acted with deliberate indifference to decedent's sanitary, health, and safety needs. Knowing

of the acts of other defendants, the lack of hygienic and sanitary precautions, the overcrowding and attendant difficulty for detainees to socially distance, the absence or inadequacy of PPE, including masks, the highly contagious nature of the virus and its serious and potentially fatal consequences, Archambeault and Dobson did nothing.

181. Worse, they systematically misrepresented to the media the conditions in the Detention Center, and ratified the retaliatory conduct of CoreCivic in punishing detainees, including Mr. Escobar, who petitioned for masks, minimally adequate medical care, testing, and a modification of living arrangements to avoid infection.

182. Archambeault and Dobson, with deliberate indifference, denied or stinted the provision of medical care, medication, testing and needed hospitalization.

183. Their conduct, and that of the other defendants, caused the death of Carlos Escobar who was entirely subject to their power and authority, and unable to obtain food, shelter or medical care for himself.

184. Defendants denied and delayed hospitalization for Mr. Escobar until he was at death's door.

185. The law requiring Constitutionally adequate provision of sanitation, safety and medical care is clearly established.

186. For more than forty years, federal law has clearly established the Constitutional rule, the liability under the Constitution, and the remedy of a *Bivens* action, for the conduct of Archambeault and Dobson.

## **PUNITIVE DAMAGES**

The conduct of defendants as alleged herein was malicious, oppressive, fraudulent and in reckless disregard of decedent's federally guaranteed rights. Plaintiffs seek punitive damages to punish and deter such conduct, as alleged in this complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof.

2) For punitive and exemplary damages.

3) For expenses and costs of suit as permitted by law.

4) For any other relief that is just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution, Plaintiffs demand a jury trial.

DATED: April 8, 2021                    Respectfully submitted,

**IREDALE AND YOO, APC**

/s/ *Eugene Iredale*
**EUGENE G. IREDALE**
**JULIA YOO**
**GRACE JUN**
*Attorneys for Plaintiffs*