EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
**IREDALE & YOO, APC**
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525   FAX: (619) 233-3221

**Attorneys for Plaintiffs the Estate of Carlos Escobar Mejia, Rosa Escobar, Maribel Escobar and Juan Antonio Escobar**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF CARLOS ESCOBAR MEJIA by and through its successor in interest ROSA ESCOBAR, ROSA ESCOBAR, MARIBEL ESCOBAR and JUAN ANTONIO ESCOBAR as individuals, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; GREGORY ARCHAMBEAULT; JAMES DOBSON; CORECIVIC OF TENNESSEE LLC; CHRISTOPHER LAROSE; JOSEPH ROEMMICH; DOES 1-7, Inclusive, and ROES 1 through 10, Inclusive, <br><br> Defendants. | CASE NO. 20-cv-2454-MMA-KSC <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1) Negligence <br> 2) Wrongful Death (CCP §377.60) <br> 3) Violation of the Bane Act <br> 4) *Bivens:* Deliberate Indifference <br><br><br> **<u>Jury Trial Demanded</u>** <br> (Rule 38, F.R.Civ.Pro.) |

COME NOW Plaintiffs THE ESTATE OF CARLOS ESCOBAR MEJIA, by and through its successor in interest ROSA ESCOBAR, ROSA ESCOBAR, MARIBEL ESCOBAR and JUAN ANTONIO ESCOBAR as individual plaintiffs, through their attorneys of record, Iredale and Yoo, APC, and allege and complain as follows:

## I.
## <u>INTRODUCTION</u>

Carlos Escobar died of COVID on May 6, 2020.  He contracted the disease while in confinement at the Otay Mesa Detention Center, a detention facility run for profit by CoreCivic and under the control of ICE officials Archambeault and Dobson.  CoreCivic and its officials, LaRose and Roemmich, detained Mr. Escobar in conditions which they knew would expose him to a deadly disease. CoreCivic deprived him of adequate personal protective equipment, proper social distancing, and appropriate prophylaxis and hygienic conditions, all with the knowledge and participation of ICE and its officials.  CoreCivic, which charged the government an extra 22 million dollars in a span of one year for unused empty beds, had the capacity to house detainees and to socially distance them.  Instead, it closed multiple housing units and forced hundreds of detainees into consolidated housing areas, making social distancing impossible.  CoreCivic then failed to meet the requirements for compliance set forth by ICE.  The medical staff employed through ICE Health Services failed to provide any medical care to Mr. Escobar as he languished for weeks, suffering.  Carlos Escobar suffered and died a needless death.

## II.
## <u>GENERAL ALLEGATIONS</u>

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

2.    Plaintiffs' claim under the Federal Tort Claims Act was timely filed. The claims have been denied.

3.    Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of California because a substantial part of the acts or omissions which form the basis of Plaintiffs' claims occurred in the Southern District of California.

### III.
### PARTIES

4.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

5.    Plaintiff decedent Carlos Escobar died in San Diego County. Plaintiffs Maribel Escobar, Rosa Escobar and Juan Antonio Escobar are residents of Los Angeles, California.  Rosa Escobar brings this action on behalf of the Estate of Carlos Escobar Mejia.  (See Exhibit 1 attached and incorporated herein by reference.)  Maribel Escobar, Rosa Escobar and Juan Antonio Escobar also bring suit as individuals.

6.    At the time of his death, Carlos Escobar was not married and had no children.  His parents were dead.  Carlos died intestate.  There is no probate proceeding pending in California for the administration of his estate.  *Id*.

7.    Maribel and Juan Antonio have elected to have Maribel Escobar serve as the decedent's successor in interest in this case.

8.    Maribel Escobar is a successor in interest as defined in Section 377.11 of the California Code of Civil Procedure and succeeds to the decedent's interest.

9.    At all times relevant to this complaint, the Department of Homeland Security was a federal agency of defendant UNITED STATES OF AMERICA and was operating in San Diego County, California.

10.    If it is determined by the Attorney General that Archambeault, Dobson and Roe Defendants were acting within the scope of their employment at the time of the incident, the action will be deemed one against the United States

- 3

and the United States will be substituted as the only defendant in the FTCA causes of action.

11.    At all times relevant to this complaint, Defendant CoreCivic, Inc. formerly known as Corrections Corporation of America, Inc. (herein referred to as "CoreCivic") was a for-profit Maryland corporation whose principal office is located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215 and whose registered agent for service of process is CT Corporation System, 800 Gay Street, Suite 2021, Knoxville, Tennessee 37929. As part of CoreCivic's business, it owns/operates jails, prisons and other correctional facilities throughout the United States under contract with various government entities.

12.    At all times relevant to this action, CoreCivic conducted business within San Diego County when operating the Otay Mesa Detention Center (OMDC).

13.    At all times relevant to this action, Defendant Christopher LaRose was the Senior Warden at the OMDC.

14.    At all times relevant to this action, Defendant Joseph Roemmich was the Assistant Warden at the OMDC.

15.    At all times relevant to this action, Defendants Does 1-7 were CoreCivic employees who instituted and/or facilitated unhygienic and dangerous practices, causing rampant infections of COVID through OMDC.

16.    Does 1-7 denied access to medical care to Mr. Escobar by failing or refusing to transport Mr. Escobar to Medical or to the Hospital.

17.    Does 1-7 failed to transmit required information regarding Mr. Escobar's vulnerable medical status or his critical medical condition to ICE as required.

18.    At all times relevant to this action, Defendant Gregory J. Archambeault was the San Diego Field Office Director for ICE Enforcement and Removal Operations (ERO), an agency within the U.S. Department of Homeland

- 4

Security.  Archambeault was charged with having legal custody of decedent, an ICE detainee.  Archambeault was required to ensure that decedent was not subjected to an unreasonable risk of disease or death while in ICE custody. Archambeault was deliberately indifferent to decedent's serious health and safety needs.

19.    At all times relevant to this complaint, Defendant James Dobson was the Otay Mesa Detention Center officer in charge of immigration detention operations at the OMDC, and was a legal custodian of decedent.

20.    Archambeault and Dobson were responsible for overseeing the operations of CoreCivic, in particular the provision of medical care to the detainees at the OMDC.

21.    At the time of Mr. Escobar's death, ICE Health Services Corps (IHSC) was responsible for running the medical unit at Otay Mesa.

22.    At all times relevant to this complaint Archambeault, Dobson and ROES 1-10 were officials, agents, and employees of ICE and were acting within the full course and scope of their agency and employment.

23.    At all relevant times, the Roe defendants 1-10 were acting in their professional capacity within the course and scope of their agency and/or employment, and/or were the agents, servants and employees of each other and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer.

24.    Upon information and belief, Roes 1-6 were medical care providers who failed or refused medical assessment, triage, care, or transportation to a hospital to Mr. Escobar.  Roes 1-6 knew that Mr. Escobar was a particularly vulnerable patient suffering from diabetes.  Roes 1-6 knew that Mr. Escobar was suffering from COVID and needed immediate medical attention.  These defendants denied medical care to Mr. Escobar for weeks.

25. Upon information and belief, Roes 7-10 were persons charged with facilitating medical care who denied Mr. Escobar access to proper care.

26. Plaintiffs are truly ignorant of the true names and capacities of DOES 1-7 and ROES 1-10, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities as well as the facts giving rise to their liability have been ascertained.

27. Plaintiffs are informed and believe and thereon allege that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by such Defendants.

## IV.
## FACTS

28. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

29. Carlos Escobar-Mejia was 57 years old at the time of his death.

30. Mr. Escobar never married. He had no children. He died intestate. Both his parents are dead.

31. Mr. Escobar is survived by two sisters, Maribel Escobar and Rosa Escobar, who are United States citizens, and a brother, Juan Antonio Escobar, who is a legal resident of the United States.

32. Mr. Escobar would have turned 58 in May of 2020.

33. Maribel and Carlos Escobar, along with their mother, escaped El Salvador during its civil war to join Rosa, who was already in the United States. One brother had been brutally murdered. They escaped El Salvador after Mr. Escobar's sister narrowly escaped being murdered.

34. Decedent had been living in the United States for 40 years. He lived with Rosa in the Los Angeles area, contributing to household expenses.

35. Mr. Escobar lived with the trauma of those events in El Salvador.

36. Mr. Escobar had criminal convictions that were about 30 years old, which included a DUI.

37. Mr. Escobar was stopped in a car by the Border Patrol in Chula Vista on January 10, 2020. He was in ICE custody from that date to the time of his death on May 6, 2020.

38. Mr. Escobar had no criminal charges pending against him.

39. Mr. Escobar was held in the Otay Mesa Detention Center. He was not accused of committing any crimes. He was waiting to appear before an immigration judge to argue that he should be allowed to remain in the country.

40. Mr. Escobar was vulnerable to the Covid virus. He was at high risk for dying if he contracted the virus because of his underlying medical conditions. Mr. Escobar suffered from diabetes. He had undergone several operations which left him without his right foot because of complications of that disease.

41. Mr. Escobar suffered from high blood pressure and heart problems.

42. Defendant CoreCivic is a private operator of correctional facilities with contracts for services with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Marshals Service ("USMS").

43. Otay Mesa Detention Center is a contract detention facility (CDF). It is an immigration detention center, owned and operated by Defendant CoreCivic and located in San Diego, California which housed, *inter alia*, ICE detainees.

44. OMDC typically houses approximately between 1200 to 1300 detainees and inmates.

45. In May of 2020, when Mr. Escobar died, OMDC housed 531 inmates, leaving hundreds of unused beds available for social distancing and safety.

46. Defendants Archambeault and Dobson, as federal officials, had a constitutional obligation to ensure that Carlos Escobar was not subjected to unsafe conditions which imposed an unreasonable risk of death. Archambeault and

Dobson were constitutionally obligated to ensure that reasonable sanitation, prophylaxis and protection from infection were afforded to decedent Carlos Escobar Mejia.

47. Instead of doing their constitutionally required job, Archambeault and Dobson acted with deliberate indifference to the safety, sanitary and health needs of Mr. Escobar and the ICE detainees. They failed to timely reduce the population in the facility. They were aware that overcrowding which made socially distancing impossible.

48. Archambeault and Dobson were aware of, and ratified, the conduct of CoreCivic, LaRose and Roemmich in imposing and maintaining conditions in the OMDC which made it a hothouse for transmission of COVID. With knowledge that those living conditions would cause disease, suffering and possible death, defendants deliberately took no remedial action of any consequence until after decedent had already been infected with COVID, suffered, and was hospitalized shortly before he died.

49. Immigration detainees are civil detainees whose constitutional protections while in custody derive from the Fifth Amendment Due Process clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Immigration detainees in Otay Mesa are entitled to greater rights than persons in pretrial criminal custody or people serving criminal sentences. *Jones v. Blancas*, 393 F.3d 918, 933-34 (9th Cir. 2004); *King v. Cty. Of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment when conditions of confinement for civil detainees are similar to those faced by pretrial criminal detainees).

50. When the government takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume responsibility for his safety and general well-being. *DeShaney v. Winnebago Cty. Dept. Of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). As a result,

the government must provide those in its custody with food, clothing, shelter, medical care, and reasonable safety.

51.    Conditions that pose an unreasonable risk of harm violate the Eight Amendment's prohibition against cruel and unusual punishment, and the Fifth Amendment's Due Process Clause.

52.    The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

53.    The Supreme Court has explicitly recognized that the risk of contracting a communicable disease constitutes such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

54.    While the Eight Amendment prohibits punishment that is "cruel and unusual," the Due Process Clause of the Fifth Amendment prohibits *any punishment at all* for someone who is not convicted of a crime. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979); *see also Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1163-64 (9th Cir. 2020). Conditions that would violate the Eight Amendment rights of an individual serving a criminal sentence are more than enough to violate the Fifth Amendment due process rights of a civil detainee.

55.    Defendant CoreCivic did not ensure proper training for its employees. It provided only six weeks of training for CoreCivic employees. The training focussed on self-defense and correctional techniques. There was brief on-the-job training for employees in the housing units for a couple of days. This involved the new Detention Officer "shadowing" the housing unit officer. There was no requirement that the officers demonstrate competence, or pass any exam or assessment.

56.    There were approximately forty hours of training for detention officers who work as segregation officers. However, there is no other on-the-job training for many of the other units.

57. Training for new officers began within only a few months of their employment. Detention Officers with very little experience train new officers.

58. CoreCivic did not train Detention Officers on how to handle infectious diseases, even though they are on the front lines of interacting with potentially infected persons.

59. Detainees are responsible for cleaning the facility. They were not trained on how to clean properly. On information and belief, the efficacy of the cleansing agent was dependent on leaving the cleaner on a surface for ten minutes. Sinks and showers were shared among dozens of detainees/inmates without disinfection between each use.

60. Detainees were not consistently given gloves, even when they were required to clean the unit with used rags. Oftentimes the cleaner ran low in the housing units and the "porters" (cleaning crew) did not have what they needed to properly sanitize the housing units.

61. During February, March and April 2020, there were serious shortages of sanitation supplies. There was very little soap or shampoo. Toilet paper was rationed in the housing units. On numerous occasions, officers and staff broke bars of soap in half to provide to detainees. There were many days when housing units were completely out of soap, shampoo, and toilet paper. There was a severe shortage of paper towels and antibacterial hand sanitizer.

62. CoreCivic repeatedly placed profits over inmate's/detainee's and Detention Officers' safety, stinting in the provision of hygienic products.

63. CoreCivic retaliated against their own officers when they raised concerns about safety.

64. On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by the novel coronavirus, a pandemic.

65. It was well established that COVID-19 is easily transmitted, especially in group settings. The disease can cause serious illness and death.

66. There was no effective cure. Until widespread vaccination, everyone is at risk of infection.

67. The CDC has explained that COVID-19 appears to spread easily and sustainably within communities. It transfers primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes, and may transfer through contact with surfaces or objects contaminated with these droplets. There is asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms.

68. According to the CDC, older adults and people who are immunocompromised, have severe chronic medical conditions such as heart, lung or kidney disease, moderate to severe asthma, obesity, diabetes, or other serious underlying medical conditions are at higher risk for more serious COVID-19 illness. Early data suggested older people are twice as likely to have serious COVID-19 illness.

69. The CDC has identified that the data suggests a disproportionate burden of illness and death among racial and ethnic minority groups and among COVID-19 deaths for which race and ethnicity data were available.

70. Individuals who survive COVID-19 may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications.

71. At the OMDC, the risk of spread was apparent. Employees of the OMDC worked in close proximity to one another and inmates and detainees who were maintained in very close quarters.

72. Taking steps to prevent the COVID-19 from entering and spreading throughout the facility was of the utmost importance in this type of working environment. Defendants were well aware of these risks and the problems these

conditions caused.  They deliberately did nothing to ameliorate the conditions until after decedent died.

73.    In or around March 2020, COVID-19 cases across the United States and in San Diego County rapidly increased.  On March 12, 2020, the CDC reported 1,215 cases with 36 deaths. By March 30, the CDC reported 140,940 cases with 2,405 deaths.  Approximately one month later, on April 28, 2020, the CDC reported 981,246 cases with 55,258 deaths.  On March 13, 2020, San Diego County reported 5 cases, and by March 23, there were 213 cases.  Approximately one month later, on April 27, 2020, San Diego reported 3,141 cases and 113 deaths.

74.    The threat of spread of COVID-19 outside of the detention center was so apparent that government agencies issued "shelter in place" orders and social distancing mandates, which requires persons to stay at least six feet distance apart from each other.

75.    By March 17, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued shelter in place limitations across the Bay Area, requiring everyone to stay safe at home except for certain essential needs.

76.    Two days later, on March 19, 2020, the State of California issued a state-wide "shelter in place" order requiring people to stay at home except for essential activities and to maintain social distancing to the maximum extent possible.

77.    During the weeks leading up to Plaintiff's death, Defendants were aware of the grave nature of COVID-19 and its rapid transmission.

78.    Before Carlos Escobar contracted COVID, Dr. Joseph Amon, an infectious disease expert, warned that absent drastic measures, "[OMDC] will not be able to prevent COVID-19 transmission once introduced into the facility." *Sagastume et al v. Archambeault et al*, Case no. 3:20-cv-00658-LAB-MSB (S.D.

- 12

Cal. Apr. 3, 2020) Doc. 2-7 – Amon Decl. in Support of Plaintiff-Petitioner's Motion for a Temporary Restraining Order, ¶ 20.

79.    At the time of Mr. Escobar's death, Otay Mesa had one of the highest numbers of cases of Coronavirus ("COVID-19") of any immigration detention facility in the country.[1]  As of June 18, 2020, official figures showed 164 confirmed COVID-19 cases among detainees at OMDC.[2] At least eleven ICE officers at OMDC tested positive.[3]

80.    During the weeks leading up to Plaintiff's death, Defendants were repeatedly advised by numerous sources to take measures to prevent the spread of COVID-19 in its facility.

81.    During the weeks leading up to Plaintiff's death, Defendants failed to adequately respond to the COVID-19 pandemic. Defendants created a deadly environment by their refusal to take protective measures.

82.    On March 12, 2020, CoreCivic posted on its website, "Consistent with CDC recommendations, personal protective equipment (PPE) such as face masks are allowed to be worn by staff and those in our care within the facility. Disposable gloves are readily available for staff conducting searches and handling property. Staff working at the front lobby screening site wear PPE."  This statement was false.

83.    CoreCivic had not provided gloves or masks to its entire staff.

84.    Instead, CoreCivic and its officials, including Doe defendants, expressly prohibited its employees from wearing masks in the housing units and

---

[1] Alejandro Lazo & Zusha Elinson, *Inside the Largest Coronavirus Outbreak in Immigration Detention, The Wall Street Journal*, (Apr. 30, 2020), https://www.wsj.com/articles/inside-the-largest-coronavirus-outbreak-in-immigration-detention-11588239002.
[2] Immig. and Customs Enforcement, *ICE Guidance on COVID-19: Confirmed Cases*, https://www.ice.gov/coronavirus (last updated June 18, 2020).
[3] *See* id.

- 13

other areas of the facility. These defendants informed their staff of this prohibition in multiple briefings sessions. On information and belief, CoreCivic informed its staff that if they provided masks to the Detention Officers, then it would frighten the inmates/detainees and CoreCivic would have to provide them to them as well, which would cause CoreCivic to go over budget.

85. Margarita Smith, an officer who was named CoreCivic's Otay Mesa employee of the year in 2019, told the press that managers frequently discouraged workers from wearing masks. "They didn't want anyone wearing masks," said Smith, who was tapped by CoreCivic to lead an employee morale committee in January. "They said it would frighten the detainees and make them think that we're sick or something."

86. Detention Officers were rarely able to find gloves. Some boxes of gloves were placed in pods, but many times they were not there or were too small. Even Detention Officers who were responsible for patting down detainees when necessary were not provided with gloves or masks.

87. The restrooms used by detainees and staff were periodically cleaned by detainees, as well as the dining hall tables and kitchen. On information and belief, the detainees did not have proper instruction on how to use the cleaner so that it was effective. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes.

88. CoreCivic and its officials did not provide any cleaning sanitizer or disinfectant wipes to staff, so staff could prevent the spread of infection. There were sanitizer dispensers in only certain areas of the facility, but they were for the most part empty.

89. Each morning, the officers were required to clock in and out through the same device, by placing a finger on the device or punching in times multiple times throughout the day. At the end of the day, they were required to answer a series of questions on the device by punching the buttons. The device was not

regularly cleaned. Even in the midst of the COVID-19 pandemic, the device never got cleaned.

90. On information and belief, the kiosk machine that the officers were required to touch in order to obtain and return keys for the different departments in which they were working at the start and end of their shifts was not regularly cleaned. Neither were the keys that were used by different Detention Officers each day.

91. Officer equipment, such as handheld radios, handcuffs, and pepper spray from Central Control were not regularly cleaned. The employee(s) in charge of handing out equipment to other officers did not wear gloves or mask while carrying out these duties.

92. The grey bins that staff and visitors place items in, such as shoes, lunch, jackets, purses, and backpacks, and which are run through a metal detector in the main lobby entrance, were not disinfected.

93. There were never any deep cleanses of the facility, even in the midst of the COVID-19 pandemic.

94. CoreCivic and its officials continued to feed detainees in the dining hall, which served approximately two housing units at the same time, approximately 240 persons at once.

95. Throughout the month of March, 2020, CoreCivic continued to hold and require employees to attend daily briefing sessions. These briefing sessions were held in a break room with approximately thirty to forty people at once.

96. During the briefing sessions, on multiple occasions CoreCivic employees raised social distancing and sanitation concerns.

97. In one briefing session, employees asked how social distancing was possible in the facility, specifically, the housing units and in the dining hall, where detainees from multiple pods were placed during meal times. The response in effect was "we understand that, but do your job," or words to that effect.

- 15

98.   Detention Officers, including Detention Officer Rincon and Officer Cabadas (who worked in the kitchen) brought up the fact that when they hand food trays to detainees, they are face to face, within approximately one foot of each other.  A Doe Defendant responded that they could absolutely not wear a face mask because it would intimidate detainees because the detainees do not have masks.

99.   On March 17, the day that San Diego limited public gatherings to 50 people and closed restaurants, CoreCivic officers pressed for clean rags, but LaRose told them there was no need because the "chemicals" were very powerful. Their questions and demands for more wipes and gels were not taken seriously.

100.   On or about March 18 or 19, 2020, detainees were directed to clean every hour in their pod.  However, detainees were given a watered-down solution to clean everything, with one part cleaner and three parts water.  CoreCivic's Safety Manager Boyce informed the staff that the majority of the cleaning product was water to prevent suicide in case a detainee drank it.

101.   Detainees reported that rags were dirty and that they were using the same towel to clean toilets, door handles, phone receivers and their hands.  One detainee told the staff that she cleaned houses and that the same towel cannot repeatedly be used.  The officers told her, "Oh, we have a special chemical.  It kills the bacteria."

102.   CoreCivic did not provide any protocols or directions related to decreasing the risk of transmission in its facility, nor directions on how to practice social distancing in the facility, nor did it implement any steps to properly disinfect and clean or provide protective gear in response to the COVID-19 pandemic.

103.   The facility was filled with so many detainees in each housing unit that social distancing was nearly impossible.  Nothing was implemented to attempt social distancing. Most of the housing units were in excess of 100 persons.  The bunk beds are no more than four feet from one another.  CoreCivic made it

- 16 -

impossible for them to line up six feet apart in order to receive their meals or to wait in line as staff move them between different areas of the facility.

104. CoreCivic did so in order to cut costs and maximize profit.

105. CoreCivic did not take temperatures of persons before they entered the facility or otherwise examine them to determine if they were experiencing any COVID-19 related symptoms until after late March 2020.

106. When CoreCivic did begin taking temperatures, it did so in the enclosed small lobby of the facility. CoreCivic was readily able to take temperatures outside of the facility to ensure persons with a temperature did not actually enter into the building. This practice increased the risk of transmission.

107. Defendant Roemmich told staff that wearing masks are prohibited unless a sign is posted, and that if they refused to take off masks, they would be "sent home on your own dime." Roemmich reportedly told staff, "Look at your ID badge. It's a number, not a name. Everyone's disposable."

108. On or about March 31, 2020, an employee tested positive for COVID-19.

109. On information and belief, the employee who confirmed positive with COVID-19 left work.

110. On April 1, 2020, the staff learned that the employee who was infected with COVID-19 had worked on mid-shift (graveyard) in Central Control and had handed out equipment to all of the employees on that shift. This could have led to the infection of each of the employees on that shift and in turn, and to others they are in contact with. This was in direct contradiction to what CoreCivic had led reporters to believe, which was that the detainees were not exposed to COVID-19 because the infected Detention Officer did not have contact with them in their housing units.

111. That same day, an officer named Gregory Arnold spoke with Warden Christopher LaRose after hearing a captain say that face masks were prohibited.

- 17

Warden LaRose told officer Arnold, "You can't wear the mask because we don't want to scare the employees and we don't want to scare the inmates and detainees."  Arnold told the warden that was ridiculous.  Arnold told the warden that he wanted to wear a mask and gloves.  LaRose was unmoved.

112.  On April 4, 2020, 35 detainees went on a five-day hunger strike because a detainee who worked in the dining hall handling food appeared to have a fever, for which he was given only ibuprofen.

113.  A detainee named Edgar Granski gave an interview to KPBS, stating that sick detainees in his pod were told to gargle saltwater instead of being tested for Covid-19.

114.  CoreCivic directed a KPBS reporter's question about the conditions to ICE, which in turn denied that there was a hunger strike at Otay Mesa.

115.  Elizabeth Cruz, a woman detained at Otay Mesa, said a detainee who was coughing badly in the cell the first week of April was removed for about a week, returned and removed again before testing positive.  Cruz said she reported chest pain and breathing difficultly for two weeks but couldn't get more than allergy medication.

116.  "I know my body and I am not well," Ms. Cruz remembers telling a nurse, who told her there was nothing more she could do.

117.  Ms. Cruz eventually tested positive and was placed in isolation with eight other infected detainees.

118.  On April 10, 2020 a box of surgical masks arrived at the facility.  The staff handed to a group of female detainees a contract written in English which the women would have to sign in order to receive a mask.  The contract was a waiver of liability against CoreCivic.  The majority of the women did not speak English.

119.  When Doe Defendant unit manager began to verbally translate the document into Spanish, one of the bilingual detainees noticed that the manager

skipped over the entire "hold harmless" section.  When the bilingual woman pointed that out, the detainees became upset and refused to sign.

120.  Doe defendant unit manager reiterated that they would not be given masks without signing.  When the women demanded the masks, Doe defendant staff threatened the women with pepper spray.

121.  Three women, including the woman who had recognized the translation error, were taken away.  The women decided to begin a hunger strike that would not end until the three women were returned.  Five hours later, the masks were distributed and the three women were returned.

122.  Around April 17, 2020, Mr. Escobar started showing symptoms of Covid-19, vomiting and feeling gravely ill.

123.  Instead of the hospital, Mr. Escobar was taken to a designated area with other detainees diagnosed with COVID-19.  Had Mr. Escobar had been taken directly to a hospital when the seriousness of his illness first became obvious, rather than being quarantined in a unit with infected detainees, he likely would have had a significantly higher probability of survival.

124.  "He complained many times," said José Antonio Vidal Basa, adding that the other men in the unit would sometimes wheel Mr. Escobar to a nurse looking for help.  "He's feeling bad," Vidal Basa recalled telling medical staff. "He never comes out of his room and he's always sick.  Can we please do something about it?"

125.  Vidal Basa, who also contracted COVID-19, said Mr. Escobar was routinely instructed to fill out a sick card, which in theory would set in motion a formal medical response from the facility.  "He would sign it and they would bring him back — the same thing over and over again," he said.  "They would never do nothing about it." Doe and Roe defendants who were charged with handling sick cards and facilitating and providing medical care failed to do so.

126. Mr. Escobar was not given any medical care and he was not taken to the hospital for weeks as he languished in his cell dying.

127. The federal government's ICE Health Service Corps is solely responsible for contracting, staffing and oversight of any medical and mental health services provided at Otay Mesa.

128. The contract between CoreCivic and the United States expressly provides that CoreCivic must provide all necessary support to facilitate the delivery of health services.

129. Accordingly, all ICE and CoreCivic officials had a duty to provide proper medical care and necessary facilitation of care to Mr. Escobar.

130. Roe Defendants 1-10 who are believed to be medical care providers and administrators were told of Mr. Escobar's urgent condition. They failed to provide any medical care.

131. Mr. Escobar had ibuprofen to treat his symptoms, the men in his unit recalled. He was living on bologna sandwiches and crackers, the only meal detainees were given for breakfast, lunch, and dinner, said Tomas Enrique Castro Lopez. According to Castro Lopez, who took on the role of caretaker for Mr. Escobar inside the facility, virtually all kitchen staff preparing the food were eventually stricken with the virus.

132. Upon information and belief, the detainees sickened with COVID-19 had to purchase food and medication from the Commissary to take care of themselves. Mr. Escobar incurred out of pocket expenses for commissary items and telephone calls as a result of contracting COVID-19.

133. During these weeks in which Mr. Escobar was given no medical care, he frantically called his sister in an attempt to get family advocacy for care. He also made calls to his lawyer to attempt to get basic medical care. As a result of defendant's conduct, decedent suffered economic loss, including expenditures for commissary items and telephone calls.

134. Mr. Escobar had to purchase pain medication from the commissary. He had to purchase supplements for basic nourishment and hydration because defendants did nothing to help his vomiting, which occurred because he contracted COVID.

135. Defendants deliberately denied medical care to decedent.

136. On April 24, 2020, Mr. Escobar was finally sent to Paradise Valley Hospital in National City and placed on a ventilator. By the time defendant transported him to the hospital, Mr. Escobar was gasping for air and dying. He received a blood transfusion but he had already been too weakened by the virus.

137. Conditions at Otay Mesa were unconstitutional because detainees were at "substantial risk of serious illness or death."

138. The U.S. District Court ordered ICE to review cases of medically vulnerable persons for release. Mr. Escobar was on the list. At the hearing in Court, Mr. Escobar was already *in extremis.*

139. At the hearing on May 4, 2020, the government admitted it was probably too late to save Mr. Escobar. The government attorney told the Court that Mr. Escobar's condition was serious and suggested prayers.

140. On May 6, Mr. Escobar died.

141. Back at Otay Mesa, the men who cared for Mr. Escobar tacked letters to his door, including apologies to his sister Rosa for failing her brother. Inside the room, his dried vomit still caked the floor.

142. After his death, CoreCivic's spokesperson Amanda Gilchrist wished "this individual's" family well and stated the company was not responsible for medical care. Gilchrist told reporters that detainees received masks and could get new ones if they requested them.

143. No one contacted Mr. Escobar's family. The only contact the family had after Mr. Escobar's family was the funeral home which demanded $1,700 for the cremation.

144. On May 8, Senate Judiciary Committee Ranking Member Dianne Feinstein called for a committee hearing on safety of ICE detention facilities following Mr. Escobar's death. Senator Feinstein issued a statement that "the death of Carlos Escobar-Mejia is deeply troubling. ICE is detaining approximately 29,000 individuals in detention centers that have a poor history of medical care."

145. Senator Feinstein noted in her letter to Senator Lindsey Graham that only 1,528 detainees had been tested and that 753 of those tested positive. "This means that nearly half of those tested are already infected with Covid-19. This warrants the Committee's immediate attention, and I ask that you hold a hearing into the death of Mr. Escobar-Mejia and conditions at ICE facilities nationwide."

146. Despite ICE stating that cloth face coverings should be worn by detainees, cloth facemasks were not distributed. Detainees finally received one (1) disposable paper mask. Those masks were to be reused again and again. They disintegrated or became dirty. When that happens, detainees were forced to wear their shirts as protective gear.

147. Soap, a basic requirement for hygiene even outside of a pandemic, was not provided to detainees on a continuous or adequate basis.

148. On Monday April 20, 2020 there were 18 migrant detainees in OMDC who had tested positive for COVID 19. Just four days later, on April 24, 2020 there were 111 detainees at OMDC who were positive for COVID-19, an increase of 517%. The abysmally inadequate precautions at Otay Mesa placed the lives of 111 people in custody, 17 CoreCivic staff, eight medical staff and eight ICE employees at the facility, who have all tested positive for COVID-19, at risk.

149. Defendants' deliberate delay or refusal to provide reasonable conditions and care constitutes objective deliberate indifference in violation of the U.S. Constitution and has caused at least 111 immigrants at OMDC to needlessly become infected with the potentially deadly virus.

150. When California Assembly member Lorena Gonzalez tried to deliver

1,000 face masks to OMDC on April 24, 2020, defendants turned the donation away, despite the continuous reports of inadequate supplies at the detention facility.[4]

151. As of April 10, 2020, ICE had in place its COVID 19 Pandemic Response Requirements (ERO PPR) which sets forth expectations and mandatory requirements.

152. CoreCivic was required to promote social distancing, limit interactions, and to monitor and isolate the sick.

153. The PPR applied to all facilities housing ICE detainees, including private vendors.

154. CoreCivic was required Report all confirmed and *suspected* COVID-19 cases to the local ERO Field Office Director (or designee), Field Medical Coordinator, and local health department immediately.

155. CoreCivic was required to notify ERO Field Office Director  and Field Medical Coordinator  in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19.  This high-risk population included people with diabetes.

156. Carlos Escobar suffered from diabetes and a leg amputation. CoreCivic was required to notify the Director and Medical Coordinator of Mr. Escobar's condition as of April 10, 2020, full seven days before Mr. Escobar was symptomatic.

157. Upon being informed of a detainee who may potentially be at higher risk for serious illness from exposure to COVID-19, ERO was required to review

[4] Kate Morrisey, Advocates with Mask Donation Turned Away From San Diego Immigration Detention Center, The San Diego Union Tribune (Apr. 25, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-04-24/advocates-with-mask-donation-turned-away-from-san-diego-immigration-detention-center.

the case to determine whether continued detention is appropriate.

158. Upon information and belief, CoreCivic officials delayed reporting to ERO of Carlos Escobar's status which prevented ERO from releasing Mr. Escobar pending his immigration hearing.

159. Archambeault, Dobson and Roe Defendants, who are ICE employees, unreasonably delayed in assessing Carlos Escobar's eligibility for release.

160. Archambeault, Dobson and Roe Defendants, after being made aware of Mr. Escobar's status as a diabetic and an amputee and his serious condition after contracting COVID, were deliberately indifferent to the denial of medical care. They chose to do nothing.

161. As of April 10, 2020, CoreCivic was under a requirement that it provide hygiene supplies, and PPE.  Detainees and staff were required to use face coverings.

162. The PRR required:

> Isolate the individual immediately in a separate environment from other individuals. Facilities should make every possible effort to isolate persons individually. Each isolated individual should be assigned his or her own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options. <u>Only individuals who are laboratory-confirmedCOVID-19 cases should be isolated as a cohort. Do not cohort confirmed cases with suspected cases or case contacts</u>.

(emphasis in the original)

163. None of these requirements were met.

164. On September 14, 2021, Department of Homeland Security's Office of Inspector General (OIG) issued an investigation report titled "Violations of ICE Detention Standards at Otay mesa Detention Center."

165. The OIG made seven recommendations for improving care of

- 24 -

detainees at the OMDC.  ICE concurred as to six of the recommendations.

166.  Dr. Joseph Cuffari, the Inspector General, found: "During our unannounced inspection of Otay Mesa in San  Diego, California, we identified violations of ICE detention standards that compromised the health, safety, and rights of detainees."

167.  Dr. Cuffari stated, "Overall, we found that Otay Mesa did not meet standards for grievances, segregation, or staff-detainee communications. Specifically, Otay Mesa did not respond timely to detainee grievances and did not forward staff misconduct grievances to ICE as required."

168.  OIG inspectors found that OMDC did not consistently enforce use of facial coverings and  social distancing.

169.  Inspectors viewed surveillance video footage from the facility and observed detainees in housing units gathered in groups not wearing masks or practicing social distancing.

170.  The inspectors found that the facility had not established a proper tracking system to ensure a timely response to detainees and that the Otay Mesa grievance coordinator was not properly managing complaints regarding staff misconduct.

171.  Otay Mesa was failing to forward grievances to a higher-level official in the chain of command in a timely manner in violation of the requirements under the Performance Based National Detention Standards.

172.  The inspectors found that Otay Mesa was only forwarding staff misconduct grievances to ICE when the detainee appeals the decision made by the facility and not when the grievance is first submitted.  The inspectors noted that this absence of oversight could potentially result in increased retaliation by officers if ICE is not aware of and able to manage staff misconduct allegations.

173.  The OIG found that detainee communication practices were deficient and in violation of the Performance-Based National Detention Standards (PBNDS)

requirements for written communication with detainees.  Otay Mesa did not maintain a log tracking detainee requests to the facility, as required, and thus was unable to ensure adequate and timely responses.

174.   In violation of the PBNDS requirement that a facility provide a secure drop box for detainees to correspond directly with ICE management, Otay Mesa had their unit employees take the form from the detainee and provide the request to ICE.  This failure caused ICE to fail to timely respond to requests in 23 percent of all requests.

175.   Inspectors found that without direct access to a secure ICE drop-box, detainees may be hesitant to submit requests or grievances to ICE for fear that facility staff may tamper with the message or punish detainees for submitting requests or grievances.

176.   The inspectors found that  the facility was unable to track whether staff were adequately and timely responding to detainee requests.

177.   According to the IG investigation of OMDC, from April 2020 to March 2021, 47 percent of the guaranteed bed space at Otay Mesa went unused. CoreCivic charged more than $22 million for unused bed space for a one-year period as a result of reduced detainee population.

178.   From July 2020 to March of 2021, CoreCivic charged the government between $10,533.62 to $13,466.60 to house each detainee per month.  That broke down to $434.48 per day per detainee in the month of January 2021.

179.   OIG found:" Because ICE was not using all its contracted beds, Otay Mesa had the ability to place fewer people in each unit to allow for appropriate social distancing.  However, Otay Mesa did not space detainees out in the housing units with the unused space, rather it closed multiple units in the facility to consolidate space. In consolidating space, Otay Mesa did not allow for appropriate social distancing."

180.   Long before the OIG report was issued, defendants CoreCivic, Larose,

Roemmich, Archambeault, Dobson, Does and Roes knew of the persistent problems at the OMDC.

181. David McGinnis, who was in charge of training at the OMDC testified in a deposition in 2018 that the detention center is purposefully understaffed by CoreCivic to save money. That understaffing, he said, would make it difficult for officers monitoring units to just take bathroom breaks, much less escort someone to the medical unit.

182. Mr. McGinnis had been the Learning and Development Manager at OMDC for 11 years. McGinnis testified in a prior case, in which a detainee died from denial of medical care, that McGinnis had personally made written complaints regarding understaffing problems through an ethical hotline.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(By the Estate Against UNITED STATES, ARCHAMBEAULT, DOBSON, CORECIVIC, LAROSE, ROEMMICH, DOES 1-7 and ROES 1-10)**

183. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

184. Defendants had a duty to execute their duties faithfully and lawfully as charged with the custody and care of detainees such as Mr. Escobar. Defendants had a duty to act with care and prudence to safeguard the health and safety of detainees. Defendants had a duty to act with care and prudence towards Mr. Escobar and to not cause harm or injury to Plaintiff.

185. These defendants had a special relationship as the jailer to ensure that Mr. Escobar was provided adequate medical treatment.

186. CoreCivic, LaRose and Roemmich had a duty to properly train their subordinates to ensure that they could carry out their duties properly to avoid causing injury to the decedent.

187. Defendants, including Doe and Roe defendants had a duty to adhere to the mandate of the ERO Pandemic Response Requirements.

- 27

188. LaRose, Roemmich and Doe Defendants had a duty to ensure that detainees would be provided basic sanitary conditions in which they would not contract a deadly virus.

189. All defendants knew that there had been a previous death at this facility from denial of medical care to a detainee who bled out and died. They knew that a long-time trainer who worked at the facility for 11 years had lodged a complaint that the understaffing was causing harm to the detainees.

190. All defendants knew that in a death of a detainee a few years before Mr. Escobar's death, a nurse had given an ibuprofen tablet to the detainee suffering from an upper respiratory infection. The detainee, Mr. Cruz-Sanchez, started coughing up blood and his condition deteriorated to the point he was unable to talk or swallow food. He developed shortness of breath, respiratory distress and wheezing but he was denied any medical care. When he was finally taken to a hospital, he was placed on mechanical ventilation and diagnosed with pneumomediastinum with extensive subcutaneous emphysema, hypoxemia, acute kidney injury, healthcare associated pneumonia, new onset of diabetes and hypokalemia. CoreCivic and its officials knew that their long-time employee David McGinnis had lodged complaints through its ethics hotline that the OMDC was understaffing its employees for profit.

191. Archambeault, Dobson and Does were aware that the medical staff under their supervision had failed to treat a critically ill patient.

192. Roes 1-10 are medical care providers and/or administrators who were US officials. They negligently failed to provide medical care to Mr. Escobar who pleaded with them for help. Archambeault and Dobson are liable for their negligent failure to supervise and train these subordinates when they were aware of the prior complaints that detainees were not receiving adequate medical care.

193. Archambeault, Dobson and Roe defendant are liable under the Federal Tort Claims Act, which permits plaintiffs to bring lawsuits against the United States for money damages for injury or death caused by the federal employees' negligence. When there is a determination by the Attorney General that these defendants were federal employees and they committed the tort within the scope of their employment, this lawsuit will be deemed an action against the United States.

194. The government has no "discretion" to violate the Federal Constitution. Its dictates are absolute and imperative. Roe defendants' Constitutional violation of Mr. Escobar's right to medical care was not subject to discretion.

195. Discretionary function exception does not apply to instances when United States actors do not follow their own self-imposed policy. The discretionary function will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow because then the employee has no rightful option but to adhere to the directive.

196. The policy that dictated Archambeault's and Dobson's conduct was the National Detention Standards 4.3 Medical Care, which required each facility to provide emergency care and hospitalization as needed within the local community.

197. This policy required:

I. Sick Call
A health care practitioner will review the request and determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time. All detainees, including those in Special Management Units, regardless of classification, will have access to sick call.

198. Mr. Escobar had no access to sick call.

199. Defendants had an obligation to supervise and train their nursing and medical staff to understand that they had to respond to request for sick call for a deadly disease within a reasonable period of time.  As a result of their failure to adhere to their own self-imposed policy, the Roe defendant doctors and nurses failed to properly see Mr. Escobar based on the acuity of his problem, which was urgent.  As a result of the failure to supervise and train as required by ICE's own policies, the subordinate medical care providers provided no sick calls to a patient dying of COVID.

200. Defendants failed to act with care and breached the aforementioned duties.  Their actions fell below the standard of care.  The breach of their duty, as described herein, was a substantial factor in causing Mr. Escobar's death.

201. As a direct and proximate result of Defendants' breach of their duties, as described herein, Mr. Escobar suffered economic damages including out of pocket expenses after being infected with COVID, such as commissary expenses for medication and nourishment and the cost of telephone calls in his attempts to receive medical care through his family's assistance.

202. The Estate of Carlos Escobar is also entitled to punitive damages against all defendants except the United States.

**SECOND CAUSE OF ACTION**
**WRONGFUL DEATH (CCP 377.60)**
**(By Plaintiffs Rosa Escobar, Maribel Escobar and Juan Escobar Against UNITED STATES, ARCHAMBEAULT, DOBSON, CORECIVIC, LAROSE, ROEMMICH, DOES 1-7, and ROES 1-10)**

203. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

204. Defendants committed wrongful acts which proximately caused the death of Carlos Escobar.

205. Defendants' decision to not follow CDC guidelines was a substantial factor in causing Carlos's death. It was reasonably foreseeable that failure to

implement social distancing policies and provide masks, gloves, and sanitation materials would lead to Carlos dying from COVID-19.

206. Otay Mesa had the ability to place fewer people in each unit to allow for appropriate social distancing. Otay Mesa did not space detainees out in the housing units with the unused space, rather it closed multiple units in the facility to consolidate space. While charging the taxpayers in excess of 22 million dollars, Corecivic, Larose, Roemmich and Does consolidated and reduced living space, preventing appropriate social distancing.

207. Corecivic, Larose, Roemmich and Doe defendants failed to provide any measures for the prevention of a deadly illness.

208. This caused rampant infections of COVID-19 and caused Carlos Escobar to die from COVID.

209. Once Defendants were aware that Mr. Escobar was ill, Doe and Roe defendants refused to transport him to the hospital. They denied him any medical care or caused him to be denied medical care for weeks.

210. These acts resulted in the death of Carlos Escobar.

211. CoreCivic is responsible for the acts of individual defendants under the theory of *respondeat superior*.

212. As alleged above and incorporated herein, Archambeault, Dobson and Roes are liable under the Federal Tort Claims Act, which permits plaintiffs to bring lawsuits against the United States for money damages for injury or death caused by the federal employees' wrongful acts.

213. The wrongful acts alleged above have destroyed Maribel's, Rosa's and Juan's relationship with their brother, Carlos Escobar, and have legally, proximately, foreseeably, and actually caused severe emotional damages, including the loss of society, companionship, comfort, counsel and care. It has caused emotional distress, and further economic and non-economic damages according to proof at the time of trial.

**THIRD CAUSE OF ACTION**
**BANE ACT**
**(By the Estate of Carlos Escobar Against UNITED STATES, ARCHAMBEAULT, DOBSON, CORECIVIC, LAROSE, ROEMMICH, DOES 1-7 and ROES 1-10)**

214.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

215.  The California Legislature declared that it violates our state civil rights act for any person to interfere with the exercise or enjoyment by an individual of his/her rights secured by the United States Constitution or state or federal law.  This includes any interference of these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

216.  As alleged above and incorporated herein, Archambeault, Dobson and Roes are liable under the Federal Tort Claims Act, which permits plaintiffs to bring lawsuits against the United States for money damages for injury or death caused by the federal employees' wrongful acts.

217.  Violating the Constitution  by failing to provide or facilitate medical care is not a discretionary act.

218.  All named Defendants violated Mr. Escobar's rights by ignoring multiple requests for medical care.  CoreCivic employees, including Larose, Roemmich, and Doe defendants, had a duty to facilitate taking Mr. Escobar to Medical.

219.  Defendants, including Roe defendants, violated Mr. Escobar's rights by refusing to provide acute care as required by ICE policies and by failing to facilitate transportation to the hospital when Mr. Escobar was critically ill.

220.  Defendants interfered with Mr. Escobar's rights to bodily integrity and humane treatment by the use of intimidation, coercion, and retaliation as alleged above.  The refusal to provide medical care and refusal to transport a

- 32

critically ill patient to a hospital was intimidating and coercive, particularly given a detainee's inability to receive medical care through another source.

221. This interference with Mr. Escobar's rights was perpetrated in violation of California Civil Code § 52.1 and Mr. Escobar's right to be free from denial of due process, right to bodily integrity and human treatment, and retaliatory animus under the California and Federal Constitutions.

222. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

223. Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

224. Mr. Escobar called his sister in desperation, and told her that he was throwing up and suffering from headaches, and that his pleas to detention center officials to see a doctor were not being acknowledged.

225. Even after defendants knew that Mr. Escobar was critically ill and vomiting, they provided no nourishment. Mr. Escobar was given a bologna sandwich for all three meals each day, which he was continuing to vomit.

226. Because Roe defendants refused medical care, Mr. Escobar had to purchase commissary items like pain medication and supplements for basic hydration and nutrition.

227. Due to the violation of Mr. Escobar's rights by these Defendants, Mr. Escobar suffered economic damages, including out of pocket costs for commissary items and telephone calls to his family as a result of his treatment by these defendants, and further damages according to proof at the time of trial.

**FOURTH CAUSE OF ACTION**
**(Bivens: Deliberate Indifference to Decedent's Constitutional Rights**
**By the Estate of Carlos Escobar Against Defendants Archambeault, Dobson,**
**and Roes 1-10)**

228.  Defendants Gregory J. Archambeault and James Dobson were federal officials, acting under color of federal law and authority.

229.  Archambeault and Dobson were the legally authorized custodians of Mr. Escobar's person.

230.  Archambeault and Dobson had a constitutional obligation to treat decedent in a reasonable and humane way, as he was within their purview, and unable to provide for his own needs.

231.  As custodians of Mr. Escobar, Archambeault and Dobson acted with deliberate indifference to decedent's sanitary, health, and safety needs.  Knowing of the acts of other defendants, the lack of hygienic and sanitary precautions, the overcrowding and attendant difficulty for detainees to socially distance, the absence or inadequacy of PPE, including masks, the highly contagious nature of the virus and its serious and potentially fatal consequences, Archambeault and Dobson did nothing.

232.  Worse, they systematically misrepresented to the media the conditions in the Detention Center, and ratified the retaliatory conduct of CoreCivic in punishing detainees, including Mr. Escobar, who petitioned for masks, minimally adequate medical care, testing, and a modification of living arrangements to avoid infection.

233.  Archambeault and Dobson, with deliberate indifference, denied or stinted the provision of medical care, medication, testing and needed hospitalization.

234.  Defendants including Roes 1-10 denied and delayed hospitalization for Mr. Escobar until he was at death's door.

235. Their conduct, and that of the other defendants, caused the death of Carlos Escobar who was entirely subject to their power and authority, and unable to obtain food, shelter or medical care for himself.

236. The law requiring Constitutionally adequate provision of sanitation, safety and medical care is clearly established.

237. For more than forty years, federal law has clearly established the Constitutional rule, the liability under the Constitution, and the remedy of a *Bivens* action, for the conduct of Archambeault, Dobson and Roe defendants.

## PUNITIVE DAMAGES

The conduct of defendants as alleged herein was malicious, oppressive, fraudulent and in reckless disregard of decedent's federally guaranteed rights. Plaintiffs seek punitive damages against the individual defendants and CoreCivic to punish and deter such conduct, as alleged in this complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof as to all causes of action.

2) For additional nominal damages as to the survival actions in the first and third causes of action.

3) For punitive and exemplary damages against all defendants other than United States of America.

4) For expenses and costs of suit as permitted by law.

5) For attorneys' fees as to the third cause of action.

6) For any other relief that is just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution, Plaintiffs demand a jury trial.

DATED: October 8, 2021                    Respectfully submitted,

                                          **IREDALE AND YOO, APC**

                                          /s/ *Eugene Iredale*
                                          **EUGENE G. IREDALE**
                                          **JULIA YOO**
                                          **GRACE JUN**
                                          *Attorneys for Plaintiffs*