**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

THE ESTATE OF CARLOS ESCOBAR MEJIA et al,

Plaintiffs,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

CASE NO. 20-cv-2454-L-KSC

**ORDER:**

**(1) SUBSTITUTING THE UNITED STATES AS DEFENDANT AND DISMISSING DEFENDANTS ARCHAMBEAULT AND DOBSON IN NON-*BIVENS*, CALIFORNIA NEGLIGENCE, WRONGFUL DEATH, and BANE ACT CLAIMS; and**

**(2) GRANTING GREGORY ARCHAMBEAULT AND JAMES DOBSON'S MOTION TO DISMISS [ECF NO. 52.]**

Pending before the Court is Defendants Gregory Archambeault and James Dobson's Motion to Dismiss Count Four of the Second Amended Complaint. (Motion [ECF No. 52.]) Plaintiffs oppose.  The Court decides the matter on the papers submitted and without oral argument.  See Civ. L. R. 7.1(d.1).  For the reasons stated below, the Court **GRANTS** Defendants' Motion.

## I.    FACTUAL BACKGROUND

Decedent Carlos Escobar Mejia ("Escobar"), originally from El Salvador, lived in the United States with his sisters for over 40 years. (Second Amended Complaint "SAC" ¶¶ 33-34.) In January 2020, Escobar was detained by ICE after Border Patrol stopped him in Chula Vista (*Id*. at ¶ 37.) Escobar had criminal convictions, including a DUI, that were 30 years old. (*Id*. at ¶ 36.) Mr. Escobar was in ICE Custody until his death on May 6, S2020, at age 57, although no criminal charges were pending against him. (*Id*. at ¶ 29, 37-38.) Mr. Escobar had been waiting to appear before an immigration judge to resolve an issue related to his immigration status. (*Id*. at ¶ 39.)  Escobar was vulnerable to COVID-19 because he suffered from diabetes, his foot had been amputated due to complications from diabetes and he suffered high blood pressure and heart problems. (*Id*. at ¶¶ 40-41.)

Escobar became infected with COVID-19 while in custody at the Otay Mesa Detention Center, an immigration detention center owned and operated by Defendant CoreCivic. (*Id*. at ¶¶ 39, 43, 122.) CoreCivic is a private operator of correctional facilities with contracts for services with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Marshals Service ("USMS"). (*Id*. at ¶ 42.) Defendant Archambeault was the San Diego Field Office Director for ICE Enforcement and Removal Operations ("ERO"), an agency within the U.S. Department of Homeland Security. (*Id*. at ¶ 18.) Defendant Archambeault was charged with having legal custody of Escobar, an ICE detainee. (*Id*.) Defendant

Dobson was the Otay Mesa Detention Center officer in charge of immigration detention operations at OMDC, and was a legal custodian of Escobar. (*Id*. at ¶ 19.) Defendants Archambeault and Dobson were responsible for overseeing the operations of CoreCivic, in particular the provision of medical care to the detainees at the OMDC. (*Id*. at ¶ 20.) The federal government's ICE Health Service Corps is solely responsible for contracting, staffing and oversight of any medical and mental health services provided at Otay Mesa. (*Id*. at ¶ 127.)

Around April 17, 2020, Escobar started showing symptoms of COVID-19, vomiting and feeling gravely ill. (*Id*. at ¶ 122). Instead of being taken to the hospital, Escobar was taken to a designated area with other detainees diagnosed with COVID-19. (Id. at ¶ 123.) Escobar repeatedly complained about his symptoms and detainees in the same unit as Escobar would wheel him to a nurse to seek help for him. (*Id*. at ¶ 124.) Escobar was given ibuprofen to treat his symptoms. (*Id*. at ¶ 131.)

On Monday April 20, 2020 there were 18 migrant detainees in OMDC who had tested positive for COVID 19. (*Id*. at ¶ 148.) Just four days later, on April 24th, there were 111 detainees at OMDC who were positive for COVID-19, an increase of 517 percent. (*Id*.)

On April 24, 2020, Escobar was finally sent to Paradise Valley Hospital in National City and placed on a ventilator. (*Id*. at ¶ 136.) By the time Defendant transported him to the hospital Escobar was struggling to breathe. (*Id*.) The U.S. District Court had ordered ICE to review cases of medically vulnerable persons for release and Escobar was on the list. (*Id*.) By the time of the court hearing on May 4, 2020, Escobar was already gravely ill. (*Id*. ¶¶ 138-39.) During the May 4th hearing, the government admitted it was probably too late to save Escobar. (*Id*. at ¶ 139.) The government attorney told the court Mr. Escobar's condition was serious and suggested prayers. (*Id*.) On May 6, Escobar died. (*Id*. at ¶ 140.)

## II.    PROCEDURAL BACKGROUND

On December 16, 2020, Plaintiffs filed a Complaint alleging seven causes of action following Escobar's death while in federal custody: (1) negligence against CoreCivic, LaRose, Roemmich, and Does 1–50; (2) intentional infliction of emotional distress against CoreCivic, LaRose, Roemmich, and Does 1–50; (3) wrongful death under California Code of Civil Procedure § 377.60 against CoreCivic, LaRose, Roemmich, and Does 1–50; (4) violation of California's Bane Act, California Civil Code § 52.1, against CoreCivic, LaRose, Roemmich, and Does 1–50; (5) violation of California's Unruh Civil Rights Act ("Unruh Act"), California Civil Code § 51, against CoreCivic; (6) violation of the Rehabilitation Act, 29 U.S.C. § 794(a), against CoreCivic; and (7) violation of Escobar's constitutional right to adequate medical care against Archambeault and Dobson pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). (SAC [ECF No. 1.])

On April 8, 2021, Plaintiffs filed a First Amended Complaint. (FAC [ECF No. 15.])  On April 22, 2021, Defendant Corecivic filed a Motion to Dismiss Plaintiff's First Amended Complaint. (MTD [ECF No. 17.])  On September 27, 2021, the Court granted in part and denied in part Defendant's motion to dismiss, dismissing all claims except for the wrongful death claim asserted by individual Plaintiffs Rosa and Maribel Escobar, and the punitive damages claim. (Order at 19 [ECF No. 28.])

On October 8, 2021, Plaintiffs filed a Second Amended Complaint limited to four claims: negligence, wrongful death, violations of the Bane Act, and Bivens: Deliberate Indifference. (SAC [ECF No. 29.])

On April 11, 2022, Defendants Gregory Archambault and James Dobson filed the present motion to dismiss count four of the Second Amended Complaint which alleges a claim under *Bivens*. (Mot. [ECF No. 52].) On May 2, 2022,

Plaintiffs filed a Response in Opposition to the Motion. (Oppo. [ECF No. 53.]) On May 9, 2022, Defendants filed a Reply. [ECF No. 54.])

### III.  LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is provided "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Twombly*, 550 U.S. at 570. The plausibility standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). A court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

//

//

## IV.   DISCUSSION

### A. UNITED STATES SUBSTITUTION

Defendants request that the United States be substituted as the Defendant, and Defendants Archambeault and Dobson be dismissed from: the First cause of action for negligence; the Second cause of action for wrongful death pursuant to CCP 377.60, and the Third cause of action under the Bane Act. (Mot. at 6).

The Federal Tort Claims Act ("FTCA") encompasses torts and wrongful acts of federal employees acting within the scope of official duties.  The only proper defendant in a suit under the FTCA is the Government.  *See* 28 U.S.C. § 2679(b)(1); *Ward v. Gordon,* 999 F.2d 1399, 1401 (9th Cir. 1993*)* In this regard, federal employees are accorded absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties.  *Wilson v. Horton's Towing*, 906 F.3d 776, 780 (9th Cir. 2018); *see also Osborn v. Haley*, 549 U.S. 225, 230 (2007).  However, only conduct that is within the scope of the employee's employment or office creates liability under the FTCA:

> Under . . . 28 U.S.C. § 2679(d), the Attorney General may certify that a defendant employee was acting within the scope of his office or employment for the United States government at the time of the incident out of which the claim arose.  In such cases, the action shall be deemed an action against the United States, and the United States shall be substituted as the party defendant.

*Wilson*, 906 F.3d at 780; *see also Osborn*, 549 U.S. at 229.

> Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee.  The litigation is thereafter governed by the [FTCA].

6

*Osborn*, 549 U.S. at 230.  An Attorney General's decision regarding scope of employment certification is conclusive unless challenged. *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017).

The Attorney General has certified that Defendants Archambeault and Dobson acted within the scope of their employment or office during the events giving rise to Plaintiffs claims in the Second Amended Complaint, and Plaintiffs do not challenge the certificate. (Certification of Scope of Employment [ECF No. 51.]) Accordingly, the United States is substituted as Defendant and Defendants Archambeault and Dobson are dismissed from the negligence, wrongful death pursuant to CCP 377.60, and Bane Act claims. *Guitierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995)("Upon [Westfall Act] certification, the employee is dismissed from the action and the United States is substituted as defendant.")

### B.  BIVENS

In the Fourth cause of action, Plaintiffs claim that they are entitled to recovery under *Bivens* because:

> As custodians of Mr. Escobar, Archambeault and Dobson acted with deliberate indifference to decedent's sanitary, health, and safety needs. Knowing of the acts of other defendants, the lack of hygienic and sanitary precautions, the overcrowding and attendant difficulty for detainees to socially distance, the absence or inadequacy of PPE, including masks, the highly contagious nature of the virus and its serious and potentially fatal consequences, Archambeault and Dobson did nothing.

(Second Amended Complaint "SAC" at ¶ 231). Plaintiffs seek damages against federal officials Archambeault and Dobson under the Eighth and Fifth Amendments for their failure to provide adequate medical care and keep detainees safe. (SAC at ¶ 51).

The Supreme Court has recognized an implied cause of action against federal employees for damages in three narrowly-defined contexts. In *Bivens*, the Court implied a remedy for a Fourth Amendment claim for excessive force and

warrantless home search.  *Bivens,* 403 U.S. at 397. Following *Bivens*, the Supreme Court extended causes of action to include a remedy for a Fifth Amendment claim for gender discrimination in *Davis v. Passman*, 442 U.S. 228 (1979) and an implied remedy for violations of the Eighth Amendment against federal prison officials for failure to treat life-threatening asthma in *Carlson v. Green*, 446 U.S. 14 (1980).

Over the course of the following years, the Court made clear that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citing *Iqbal*, 556 U.S. at 675); see also *Hernandez v. Mesa*, 140 S. Ct. 735, 742-43 (2020)("We have stated that expansion of *Bivens* is 'a disfavored judicial activity,' and have gone so far as to observe that if 'the Court's three *Bivens* cases [had] been ... decided today,' it is doubtful that we would have reached the same result[.]" (quoting *Ziglar*, 137 S. Ct. at 57) (internal citations and quotation marks omitted).

Accordingly, when asked to extend *Bivens*, courts must engage in a two-step inquiry. *See Hernandez*, 140 S. Ct. at 743. First, a Court considers "[i]f the case is different in a meaningful way from previous Bivens cases" and if so, the context is new.  *Ziglar*, 137 S.Ct., at 1859. "When we find that a claim arises in a new context, we proceed to the second step and ask whether there are any "'special factors [that] counse[l] hesitation' about granting the extension.'" *Hernandez*, 140 S.Ct. at 743. If there are any special factors causing "reason to pause before applying *Bivens* in a new context," a court may not recognize a *Bivens* remedy. *Hernández*, 140 S.Ct. at 743.

> The [Supreme] Court has not defined the phrase 'special factors counselling hesitation.' The necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a "special

factor counselling hesitation," a factor must cause a court to hesitate before answering that question in the affirmative."

*Ziglar*, 137 S.Ct. at 1858.

The two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert v. Boule* 142 S.Ct. 1793, 1803 (2022). "'[E]ven a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy." *Nestlé USA, Inc. v. Doe*, 593 U. S. _, 141 S.Ct. 1931, 1937, (2021) (plurality opinion). "[T]he most important question is who should decide whether to provide for a damages remedy, Congress or the courts?" *Hernández*, 589 U. S., at __, 140 S.Ct., at 750 (internal quotation marks omitted).

The Court must also consider whether "Congress has created 'any alternative, existing process for protecting the [injured party's] interest'" as "that itself may [constitute] a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Ziglar,* 137 S.Ct. at 1858. When considering alternative processes, the Court does not need to determine whether a *Bivens* action would disturb an existing remedial scheme, or whether the Court "should provide for a wrong that would otherwise go unredressed," *Egbert*, 142 S.Ct.1804, citing *Bush*, 462 U.S. at 388, 103 S.Ct. 2404. In addition, the Court need not consider whether "existing remedies do not provide complete relief." *Id*.

The Court first considers whether Plaintiffs claims constitute a new *Bivens* context. Factors to consider in conducting this inquiry include, but are not limited to:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into

the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar,* 137 S.Ct. at 1860.

The United States argues that the Court should not extend *Bivens* to include Plaintiffs' cause of action for deliberate indifference. (Mot. at 1). First, multiple factors distinguish this case from *Carlson*, the only remotely analogous Supreme Court decision to imply a *Bivens* remedy. (*Id*. at 7-8). Second, Defendants argue that Escobar had other alternative forms of judicial relief available to him which factors against extending *Bivens*. (*Id*. at 9). And finally, Defendants contend that other factors counsel against extending *Bivens*, including that *Bivens* actions cannot be used to challenge immigration policy, Congressional action in response to COVID-19 has been robust but no damages action has been created, and it would be impracticable to devise a workable individual- capacity cause of action for the breadth of governmental actions Plaintiffs challenge. (*Id*. at 13-18).

In response, Plaintiffs argue that Defendants' denial of medical care to Escobar is squarely within the *Bivens* context under *Carlson* because Archambeault and Dobson failed to follow ICE COVID-19 policies, thereby acting with deliberate indifference to Escobar's serious medical needs. (Oppo. at 6,10, 14-15). Even if Escobar's claims are an extension of *Bivens*, Plaintiffs contend it is a modest one because the actions of defendants in both cases caused serious harm to each of the prisoners. (*Id*. at 16-17). Though Defendants claim the existence of alternative remedies, including injunctive and habeas relief, this does not preclude a *Bivens* remedy. (*Id*. at 18). Plaintiffs strongly assert that special factors do not counsel against extending Bivens because (1) Plaintiffs are not challenging immigration policies, but the failure of individual federal officers to follow the ICE COVID-19 Pandemic Response Requirements, (2) Congressional silence does not indicate that a damages remedy is precluded because members of Congress were aware that a *Bivens* remedy already existed

so there was no need to codify a new response, and (3) Defendants are not entitled to qualified immunity in light of the long line of cases establishing that "recklessly ignoring known dangers to inmates and denying medical care to gravely ill people was unconstitutional."  (*Id*. at 23).

In considering whether to imply a *Bivens* action here, "our watchword is caution." *Hernandez,* 140 S.Ct. at 742. Plaintiffs do not identify any Supreme Court cases recognizing a *Bivens* deliberate indifference claim against ICE officers and this Court is not aware of any guiding precedent allowing similar claims to proceed under *Bivens*. Given the lack of clear precedent, the Court must determine whether Plaintiffs' deliberate indifference claim is a new context by considering whether it differs in a meaningful way from previous *Bivens* cases.

*Carlson* established that a prisoner's claim for inadequate medical care under the Eighth Amendment may proceed under *Bivens*, therefore it is the most analogous case to Plaintiffs' case for comparison purposes. In *Carlson*, federal prison officials repeatedly failed to properly treat decedent Jones' asthma leading to his death. *Carlson*, 446 U.S. 446 at 15; *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978). Plaintiffs argue that the current deliberate indifference to medical needs claim is similar to the inadequate medical care claim in *Carlson*, citing *Toney v. Williams*, No. 18-CV-2786-WQH-KSC, 2020 WL 1912168 (S.D. Cal. Apr. 20, 2020), a Southern District of California case, for the proposition that "while [plaintiff's] claim is one brought under the Fifth Amendment rather than the Eighth Amendment…a claim of deliberate indifference to a serious medical need through denial of treatment based on a *policy* while incarcerated or detained is sufficiently similar to the claims raised in *Carlson*." (Oppo. at 15)(emphasis added).[1]

---

[1] Plaintiffs also cite to the Third Circuit case *Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018) in support of their claim that it is immaterial that Plaintiffs are raising a Fifth Amendment claim and not an Eighth Amendment claim, and to support their argument that alternative remedies are insufficient here. The Court notes that Bistrian is not-binding, and that the arguments regarding the Fifth Amendment and alternative remedies are unavailing if considered.

Not only is *Toney* non-binding on this Court, Plaintiffs themselves argue that they are not challenging the *policy* in effect at the detention center, but Archambeault and Dobson's failure to follow the COVID-19 policy. Accordingly, the claims are meaningfully different.

Another meaningful difference between the claims in *Carlson* versus the present claim is that the federal prison officials in *Carlson* were operating under the legal mandates of the Bureau of Prisons, whereas Defendants Archambeualt and Dobson, were immigration officials operating under the legal mandates of ICE to oversee the operations of CoreCivic, a private detention facility operator for ICE detainees. *Egbert*, 142 S.Ct. at 1814. As the Supreme Court held in *Ziglar*, a meaningful difference in claims can arise where the statutory or other legal mandate under which the officer was operating were different. *Ziglar*, 137 S.Ct. at 1860.

The differences noted above between Plaintiffs' claim and the claim in *Carlson* indicate that even if the claim is considered to be a new *Bivens* context, it is not a "modest extension" as found in *Hoffman v. Preston*, 26 F.4th 1059, 1061 (9th Cir. 2022).

In addition, allowing a *Bivens* claim in this context would risk disruptive intrusion by the Judiciary into the functioning of other branches, specifically Congress, who have actively addressed the spread of COVID-19 in private detention facilities. As the parties point out, Congress took an interest in the pandemic response within ICE detention facilities generally and in Escobar's death specifically, with Senator Feinstein issuing a statement discussing Escobar's death and the "conditions at ICE facilities nationwide."  (Mot. at 4; SAC at ¶ 145.) In response, bills were introduced in Congress directed toward the

COVID-19 emergency in detention facilities, indicating that judicially created remedies would potentially run afoul of these efforts.[2]

The existence of alternative processes also precludes the expansion of *Bivens* to the current claim.  The Supreme Court has "consistently rejected invitations to expand *Bivens*" where alternative remedies existed. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001).  Alternative processes were available to Escobar in the form of grievance processes, change of custody requests under the Immigration and Nationality Act under 8 C.F.R. § 236.1(c), injunctive, and habeas relief in the district court.[3] Plaintiff argues that that prospective relief such as an injunction or habeas grant would be inadequate to cure the harm suffered by Escobar, and the Court agrees based on Escobar's rapid and fatal decline after contracting COVID-19.  However, the availability of alternative remedies precludes recognizing a *Bivens* action for the current claim. See *Egbert*, 142 S.Ct. at 1804; *Hoffman v. Preston*, 2022 WL 6685254 (9th Cir. 2022).

While Defendants claim that special factors counsel hesitation to expand *Bivens* here because the political branches have expansive constitutional authority regarding immigration policies, Plaintiffs are not challenging the ICE *policies* in place when Escobar fell gravely ill, but instead are arguing that Defendants Archambeault and Dobson failed to follow the policies in place to curb COVID-19 in detention facilities. Because Plaintiffs claims do not implicate immigration policies as a whole, but instead the actions of individual officers, this separation of powers argument is unavailing.

In contrast, the failure of Congress to create a statutory damages remedy against federal officials overseeing immigration detention facilities for their

---

[2] S.681 COVID-19 in Immigration Detention, https://www.congress.gov/bill/117th-congress/senate-bill/681/text; Federal Correctional Facilities COVID-19 Response Act, https://www.congress.gov/bill/117th-congress/senate-bill/328 ;

[3] ICE Grievance process, https://www.ice.gov/doclib/detention-standards/2011/6-2.pdf

responses to the pandemic counsels against expanding *Bivens*. As both parties acknowledge, Escobar's case came to the attention of multiple members of Congress, and the overall conditions at the detention center drew the attention of local and national lawmakers. Yet, despite the awareness and concern expressed by lawmakers, Congress' failure to authorize "damages actions for injury inflicted [by immigration officials in private detention centers], while providing alternative avenues for compensation in some situations—gives us further reason to hesitate about extending *Bivens*." *Hernandez*, 140 S.Ct. at 749. Therefore, special factors counsel hesitation to expand *Bivens* to the current claim. *Carlson*, 446 U.S. at 18.

Construing the facts in the light most favorable to Plaintiffs, the Complaint fails to plead sufficient facts to state a claim for relief on the *Bivens* claim that is plausible on its face because meaningful differences exist between *Carlson* and the current claim, alternative remedies exist, and Congress is better suited to fashion a remedy if needed. *See Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d at 337–38; *Twombly*, 550 U.S. at 570.

//

//

//

//

//

//

//

//

//

//

//

//

//

V.    CONCLUSION AND ORDER

For the foregoing reasons, the Court

(1) **GRANTS** Defendants request to substitute the United States as Defendant and **DISMISSES** Defendants Archambeault and Dobson in Plaintiffs non-*Bivens*, negligence, wrongful death, and Bane Act causes of action, and

(2) **GRANTS** Defendants motion to dismiss Plaintiffs' *Bivens* act claim against Defendants Archambeault and Dobson, and dismisses Defendants qualified immunity arguments moot.

**IT IS SO ORDERED**

Dated:  December 2, 2022

Hon. M. James Lorenz
United States District Judge